**NATIONAL RECRUITERS, INC., Respondent,**

v.

**Daniel "Marty" CASHMAN, et al., Appellants.**

No. 81–241.

Supreme Court of Minnesota.

Aug. 27, 1982.

Smith, Juster, Feikema, Malmon & Haskvitz and J. Christopher Cuneo, Minneapolis, for appellants.

Miller & Boeder and Brian H. Miller, Minneapolis, for respondent.

WAHL, Justice.

This appeal involves four cases consolidated for trial in Hennepin County District Court. Respondent National Recruiters, Inc. (National) sought damages and an injunction to enforce a restrictive covenant against appellants, four of its former employees. National also brought actions against Career Resources, Inc.; Career Resources' president, Micah Garber; and Corporate Resources, Inc., for tortious interference with contractual relations between National and its employees. Appellant employees counterclaimed for their vested interests in National's profit-sharing plan and trust, and appellant Cashman counterclaimed for defamation of his business,

trade and professional reputation. The trial court found the restrictive covenant valid and awarded National liquidated damages, denied National's claim of tortious interference, granted appellants' counterclaims for their vested interests in the profit-sharing plan and denied Cashman's defamation claim. We affirm in part, reverse in part, and remand for further proceedings.

National is an employment agency owned and managed by Arnold Stern. It hires recruiters who are responsible for finding applicants and filling orders from companies that are looking for employees. The recruiters work in one of four areas of specialization, making phone contact with personnel people at various companies and gathering information about available jobs. National does not have exclusive agreements with either the applicants or the companies from which it seeks job orders. Much of the information handled by the recruiters is public and readily accessible.

Appellants Bujold, Strong, Cashman and Holtzman were all employed as recruiters for National. Each had prior sales experience, and each had been unemployed for a period of time before beginning with National. Strong, Cashman and Holtzman were 51, 50 and 45 years of age respectively and were highly experienced. During the employment interview, each appellant was told of the compensation he would receive by way of commissions and bonuses and of National's pension plan. None was told that he would be required to sign a noncompetition agreement.

Appellants were told to report to work on Monday morning. After coming to work, they were told they would have 2 days to prepare for a State Licensing Examination which they took the following Wednesday. Thereafter, each was presented with a noncompetition agreement and told that he must sign the agreement in order to work for National. Bujold was given the contract sometime after he had taken the examination, Cashman and Holtzman were given the contract on Friday of their first week, and Strong was shown the contract 1 week after starting work. Each signed the noncompetition provision under protest.

The noncompetition covenant consisted of an agreement not to compete for a period of 1 year within 50 miles of the Minneapolis office of National or the Minneapolis Courthouse. It provided that, upon violation of the covenant, National could seek injunctive relief to prevent further competition and could obtain liquidated damages equal to an "agreed value" for the training received. For Bujold, Holtzman and Strong, this amount was $2,500. For Cashman, this was $5,000 for the training, plus an additional $10,000 as "liquidated damages." The contracts also provided for an additional payment in the event a former employee became associated as *"owner, operator, partner, officer, principal, shareholder, manager, departmental supervisor or in any other equity position* in an employment agency" within 1 year after leaving National. (Emphasis in original.) The Bujold, Holtzman and Strong contracts provided for $15,000 payments and the Cashman contract for a $50,000 payment in the event of a breach of this clause.

All four appellants went to work at other employment-recruitment agencies after leaving National. Bujold, who was fired in July 1978, and Strong, who left National in 1980, went to Corporate Resources, Inc., one of the defendants in the court below. After being fired by Stern, Cashman went to Career Resources, Inc., another of the defendants in this case. Holtzman left National in January 1980 and began work in April of that year at another employment agency which he later purchased.

Bujold made three placements between 6 months and 1 year after leaving National, two of which grossed fees in the amounts of $4,300 and $2,800. Strong made one placement generating a $3,440 fee after leaving National. Cashman made two placements after termination of his employment with National, one for $4,000 and another for $7,500. Holtzman was the most successful of the appellants, making two placements within the 6 months following termination, and several placements thereafter.

Stern drafted the noncompetition agreement to prevent employees from setting up a business and placing applicants whose names they had obtained while employed at National. The agreement had been modified over the years to protect against any competition that would be damaging to Stern's firm's business. National sued each of the appellants for violating terms of the noncompetition agreement and, in addition, refused to pay appellants their vested interests in National's profit-sharing plan because of the alleged breach. National contended at trial that it could suffer damages in several ways: (1) if a former employee were to make placements at a firm National also contacts, (2) if a former employee were getting job orders from a company National also contacts, or (3) if a former employee were to deal with an applicant with whom National also dealt. In the first instance, the damages would be the net profit National would have earned by making the placement; in the second and third instances, damages would be more difficult to determine.

In the course of working as employment recruiters at their new firms, appellants had occasion to call many of the same companies they had called while searching for job openings at National. However, they did not try to imply to these companies that they still worked for National and, with one exception, did not keep in contact with applicants with whom they had worked at National. The exception involved an applicant with whom Cashman had dealt. Cashman stopped dealing with the applicant and with the company that had the job opening after Stern complained to Cashman's superior.

While working for National, recruiters worked with several different forms that Stern had developed over the years. These included referral notices, acceptance letters and job-order forms. They also had access to lists of companies that had provided job orders and maintained files on the people they had contacted. Corporate Resources uses a referral notice and acceptance letter which are very similar to those used by National, but its job-order form is somewhat different.

In preparation for their licensing examination, National's recruiters read training materials and listened to tapes that Stern purchased several years earlier for approximately $400. The trial court found that this training was of little value. The useful training that the recruiters received was their on-the-job work contact with other recruiters and attendance at morning meetings.

The trial court weighed the evidence and decided that:

> The legitimate needs of plaintiff, if any, are (1) for protection against employees taking applicants who are about to be placed with them when they leave plaintiff to go in competition with it; and (2) for protection against employees taking plaintiff's current files, lists, and job orders, or copies thereof, with them when they leave plaintiff to go in competition with it.

The court went on to find that appellants had not violated National's legitimate needs. However, the court enforced the noncompetition covenant and assessed damages based on the liquidated-damages clause in the contracts.

Cashman's counter-claim for defamation rests on the following evidence: When Stern learned that Cashman had gone to work for Career Resources, he called its president, Micah Garber, and demanded that Cashman be fired. During the conversation, Stern told Garber that Cashman was "nothing but a god damn loser, a no good son of a bitch," and that "if he hired [Cashman], he was a fool." The court, while finding that the statement had been made, found no evidence of actual damage to Cashman's reputation.

This appeal raises four issues: (1) whether the noncompetition covenant, which is part of each appellant's employment contract, is valid and enforceable; (2) whether appellants have forfeited their vested interests in National's profit-sharing plan; (3) whether Corporate Resources, Inc., or Career Resources, Inc., and its president, Micah Garber, are subject to damages for tortious interference of contractual relations between Cashman and National; and (4) whether the trial court erred in denying Cashman's defamation claim because Cashman had not proved actual damages.

 1. We look upon restrictive covenants with disfavor, carefully scrutinizing them because they are agreements in partial restraint of trade. *Bennett v. Storz Broadcasting Co.*, 270 Minn. 525, 533, 134 N.W.2d 892, 898 (1965) (citations omitted). Where such a covenant is not ancillary to the initial oral employment contract, it can be sustained only if supported by independent consideration. *Modern Controls, Inc. v. Andreadakis*, 578 F.2d 1264 (8th Cir. 1978). Appellants in the case at bar were told of National's compensation provisions and pension plan before beginning work. They agreed to work for National and, in fact, did begin work before being presented with the noncompetition clause and told they were required to sign it. The clause was not bargained for. It was not ancillary to the employment agreement. It must be supported by independent consideration.

Was the noncompetition agreement supported by independent consideration? National argues, as did the employer in *Davies & Davies Agency, Inc. v. Davies*, 298 N.W.2d 127 (Minn.1980), that continued employment is sufficient consideration for a noncompetition agreement even where that agreement has not been bargained for. In *Davies* we required more. As to one employee, Richard Davies, who had not been shown the agreement and did not sign it until 4 months after beginning work, we found that continued employment for 10 years, advancement within the agency, and increased responsibility formed sufficient consideration to support a restrictive covenant in the employment agreement.

A second employee of the Davies Agency, Robert Buckingham, knew before beginning work that he would be required to sign a noncompetition agreement. He was not aware of the terms of the agreement and was not shown and asked to sign the agreement until 11 days after beginning work. We held that continued employment alone was not sufficient to support the covenant.

Unlike Richard Davies, Buckingham had not "derived substantial economic and professional benefits from the agency after signing the contract." *Id.* at 131. We affirmed the trial court's decision that the noncompetition agreement was without consideration and unenforceable.

■ "The adequacy of consideration for a noncompetition contract or clause in an ongoing relationship should depend on the facts of each case." *Id.* at 130. The training that appellants received and which was set forth as consideration in the written contract did not, in fact, constitute consideration for the noncompetition clause because it was part of the oral employment agreement. It was not a real advantage bargained for in consideration of signing the contract. There was no advantage which inured to appellants' benefit as a result of the signing of the noncompetition agreement.

■ The practice of not telling prospective employees all of the conditions of employment until after the employees have accepted the job, like the practice of requiring a lie detector test in *State v. Century Camera, Inc.*, 309 N.W.2d 735 (Minn.1981), takes undue advantage of the inequality between the parties. Appellants and National were parties to an employment agreement after they had completed negotiations on compensation, duties, benefits and other terms of employment. *See Kistler v. O'Brien*, 464 Pa. 475, 347 A.2d 311 (1975). An addition to that agreement would require independent consideration. We hold the noncompetition clause invalid because it was unsupported by such additional independent consideration. Because we reverse the trial court on this issue and find the noncompetition clause invalid, we do not consider the propriety of either the liquidated-damages clause or the denial of injunctive relief.

■ 2. National argues that its profit-sharing plan was properly amended after appellants began work to provide for a forfeiture of benefits in the event of an employee's breach of the noncompetition agreement and that, by breaching the agreement, appellants forfeited their vested interests in that plan. Since we have held that the noncompetition agreement is invalid because unsupported by consideration, there can be no breach of the agreement. We affirm the trial court's determination that appellants did not forfeit their vested interests in the profit-sharing plan.

■ 3. National's argument that Corporate Resources, Inc., Career Resources, Inc., and Micah Garber induced appellants Strong and Cashman to breach their noncompetition covenants is without merit. National did not prove a necessary element of a claim of tortious interference: that either Corporate Resources, Inc., Career Resources, Inc., or Micah Garber intentionally procured a breach of the contract. *Snowden v. Sorenson*, 246 Minn. 526, 532, 75 N.W.2d 795, 799 (1956). In order to prove that the two companies and Garber intentionally induced Cashman and Strong to violate their noncompetition covenant, National must show more than the mere offering of a job. We affirm the trial court's finding that there has been no tortious interference with contractual relations between National and its former employees, Cashman and Strong.

■ 4. Cashman contends that the trial court erred in refusing to find slander *per se* on the basis that no actual damages were proved. In Minnesota, "[w]hen words are defamatory per se * * * punitive damages are recoverable without proof of actual damages." *Anderson v. Kammeier*, 262 N.W.2d 366, 372 (Minn.1977). Therefore, the question is not whether Cashman suffered actual damages but whether Stern's words were defamatory *per se.*

■ The determination of whether Stern's communication was defamatory was a question of fact for the court.

[I]mputations affecting a person's conduct of business, trade, or profession are actionable without proof of special damage. The words, however, must be peculiarly harmful to the person in his business. General disparagement is insuffi-

cient. It must depend on the occupation and the particular statement. In other words, the remarks must relate to the person in his professional capacity and not merely as an individual without regard to his profession.

*Id.* at 372.

■ Stern characterized Cashman to his new employer, Garber, as "nothing but a god damn loser, a no good son of a bitch." Stern testified at trial that desire, motivation, commitment to business, intelligence and maturity are critical to success in the employment agency business. To characterize Cashman as a loser was to attack those qualities which are essential to success. We find as a matter of law that the words "nothing but a god damn loser, a no good son of a bitch," applied to an employment recruiter in a conversation with that employee's subsequent employer, to be slander *per se* and remand this part of the case to the trial court for assessment of punitive damages.

We reverse the judgment of the trial court insofar as it upholds the noncompetition clause and awards damages for breach of that clause. We affirm the trial court's determination that appellants did not forfeit their vested interests in a profit-sharing plan and its finding of no tortious interference with contractual relations. We remand to the trial court only the defamation counterclaim for a determination of punitive damages.

Reversed in part, affirmed in part and remanded.