Richard E. FREEMAN, Appellant,

v.

The DULUTH CLINIC, LTD.,
Respondent.

No. C6–83–289.

Supreme Court of Minnesota.

May 27, 1983.

Van Evera, Koskinen, Clure, Andrew & Signorelli and Thomas F. Andrew and Bruce H. Johnson, Duluth, for appellant.

Johnson, Friden, Killen, Thibodeau & Seiler and Joe J. Roby, Jr. and Thomas Thibodeau, Duluth, for respondent.

**WAHL, Justice.**

This case involves a covenant not to compete between a medical subspecialist and the multispecialty corporate medical clinic with which he practiced. Appellant Dr. Richard Freeman raises important issues regarding the arbitrability of the covenant in question, the consideration necessary to support such a covenant, and the enforceability of the covenant as against public policy. We conclude that the parties did not agree to arbitrate the issue of consideration and that no consideration for the covenant not to compete existed. We reverse the decision below, which confirmed the arbitration award in part and reversed it in part.

Dr. Freeman, a neurosurgeon, and the Duluth Clinic (Clinic) entered into a written contract of employment when Dr. Freeman was hired in 1976. The contract contained an arbitration clause but did not contain a covenant not to compete.

Dr. Freeman became recognized as an outstanding neurosurgeon in the community and gave leadership to the development of new diagnostic and treatment facilities at Duluth medical facilities other than the Clinic, including St. Luke's Hospital. His yearly compensation rose from $48,000 in 1977 to $143,000 in 1979. In 1979, he became head of the Clinic's neurosurgery department, which consisted of himself and two other neurosurgeons. A fourth Duluth neurosurgeon practiced alone.

On October 24, 1979, the Clinic administration called a meeting of the department heads of the Clinic and presented Dr. Freeman and the other department heads with new employment contracts. The new contracts were, for all intents and purposes, identical to the original contract signed by Dr. Freeman in 1976 except that they contained, in addition, a covenant not to compete. This covenant not to compete prohibited the doctors from practicing medicine or establishing a practice in competition with the Clinic within a radius of 35 miles from the principal place of business or practice of the Clinic for a period of 2 years after termination of the agreement or termination of employment.

New employees, the department heads were informed, would be required to sign the new contracts; all veteran employees were requested to do so voluntarily. Without negotiation, Dr. Freeman and two other department heads signed the "new" contract at that meeting. Dr. Freeman later testified that he did not think he would be bound unless the other doctors signed. As of March 1982, when Dr. Freeman's employment was terminated, out of approximately 70 Clinic physicians, 14 veteran physicians, including the other two neurosurgeons, had refused to sign.

Dr. Freeman received no additional compensation, benefits or additional authority as a result of signing. All other Clinic physicians, signers and nonsigners alike, including the two nonsigning neurosurgeons, received identical benefits, were compensated under the same formula, and were in no way penalized for not signing. The Clinic agrees that the nonsigners would have been free to terminate their employment with the Clinic and enter into competition with the Clinic.

Internal problems arose in the neurosurgery department in 1981. Dr. Freeman had been granted his repeated requests to train a personal surgical technician to assist him in his surgery instead of having to use a technician from a hospital pool. He felt that his use of a personal surgical technician permitted him to give his patients better care. Because Dr. Freeman's use of the technician exacerbated the department's problems, however, the Clinic determined to reassign her to other duties in the Clinic. Dr. Freeman sought to enjoin the Clinic from reassigning the surgical technician and to arbitrate this personnel dispute. This claim became moot when the technician quit and was rehired personally by Dr. Freeman in violation of Clinic policy. On March 30, 1982, the Clinic terminated Dr. Freeman's employment with 30 days notice. At the same time, the Clinic learned that Dr. Freeman intended to begin private practice in Duluth. Thus, the Clinic counterclaimed in the original suit for an order compelling arbitration of Dr. Freeman's alleged violation of the covenant not to compete.

Dr. Freeman replied, resisting arbitration on the principal grounds that the contract containing the covenant not to compete was invalid because it was induced by false representations, it was without consideration, and its enforcement was against public interests and public policy. He opened his own neurosurgery practice on April 26, 1982.

The trial court, on affidavits and oral argument, without a hearing, and under the mistaken impression that no written contract of employment had previously existed, ordered arbitration of the validity of the covenant not to compete, leaving the arbitrators to determine, in the first instance, the questions of consideration, public policy and fairness of the covenant.[1]

The arbitration panel, composed of three attorneys, decided, with one arbitrator dissenting, (1) that the covenant not to compete in the 1979 contract was valid as to Dr. Freeman because consideration existed in the stability and sense of unity that the agreement brought to the Clinic, and (2) that some restraint was necessary for protection of the Clinic's business but that the covenant not to compete was too broad. Fashioning an award which modified the covenant, the panel prohibited Dr. Freeman from practicing neurosurgery within 35 miles of Duluth until a replacement at the Clinic was trained and functioning, but in no event longer than one year from his termination, and ordered $5,000 damages for each month he practiced in violation of that order.

The trial court, denying Dr. Freeman's motion to vacate the award, granted the Clinic's motion to confirm the award but rejected the panel's award of damages. The court affirmed the arbitrator's determination that there was adequate legal consideration for the covenant not to compete but held that the issue of damages should await trial. Dr. Freeman appealed the determination of the contract's validity and the propriety of the injunction. The Clinic filed notice of review on the issue of damages. This court, by agreement of the parties, stayed the injunction pending determination of the appeal on the merits.

1. The Clinic argues that the arbitrators did not exceed their authority in determining the validity of the contract, that there was no fraud or corruption involved, and, therefore, that confirmation of the arbitrators' decision is required.

1. The Clinic argues in its brief that Dr. Freeman did not appeal the district court order compelling arbitration and that the time for appeal has long since expired. An order compelling arbitration, however, is not appealable under Minn.Stat. § 572.26 (1982).

If an issue is arbitrable, a court may not review the merits of the arbitrators' decision absent one of the grounds enumerated in Minn.Stat. § 572.19, subd. 1 (1982).[2] The crucial question here, then, is whether the claim of lack of consideration was arbitrable or whether the trial court should have determined that issue before compelling arbitration.

The trial court correctly recognized that public policy in Minnesota favors arbitration of disputes where the parties have entered into an arbitration agreement. Thus, we have held, in *State v. Berthiaume,* 259 N.W.2d 904, 909 (Minn.1977), that the court should order arbitration in the first instance, subject to de novo review, if arbitrability is reasonably debatable. The trial court apparently proceeded on this authority, for both the 1976 and 1979 contracts contained a broad agreement to arbitrate all disputes.

Arbitration, however, involves construction of valid and enforceable contracts. Minnesota Statutes § 572.08 (1982) makes arbitration agreements enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." To the same effect, Minn.Stat. § 572.09(a) (1982) provides that a court may order a party to arbitration except that, "if the opposing party denies the existence of agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised * * *." We utilized section 572.09(a) in *Atcas v. Credit Clearing Corp. of America,* 292 Minn. 334, 197 N.W.2d 448 (1972), to hold that, where fraud in the inducement is alleged, the trial court must proceed to determine whether the parties agreed to arbitrate that issue. We reasoned that, since fraud in the inducement, if proved, would vitiate the parties' contract, it would vitiate the arbitration agreement as well.

█ Our holding in *Atcas* gives guidance in this case. A claim of lack of consideration, if proved, would also vitiate the entire agreement, including the arbitration clause.[3] Thus, as there may be no agreement to arbitrate, the arbitrability of a claim of lack of consideration, like fraud, should be determined by the district court before compelling arbitration.

The procedure set out in *Atcas* requires the trial court to first ascertain the intent of the parties as expressed in the language of the arbitration clause.[4] No specific reference is made in the clause before us to arbitration of the issue of lack of consideration. The language used, "[a]ll disputes or differences that may arise under this agreement shall be submitted to arbitration for decision," is no broader than the language in *Atcas,* which we held not to include the issue of fraud.

█ The second *Atcas* requirement is that the party seeking rescission must rescind in toto. The Clinic argues that Dr. Freeman affirmed the contract by seeking to arbitrate the dispute over the surgical technician. Since termination, however, Dr. Freeman has sought total rescission, never requesting damages, which is the specific item of affirmance mentioned in *Atcas* as irreconcilable with rescission. We hold that the issue of lack of consideration was not arbitrable under the arbitration agreement in this case. We see no need to remand for further hearing, however, because the trial court here made what the Clinic's counsel acknowledged at oral argu-

---

**2.** Because we reverse, the damages award is vacated. We note, however, that, as the parties did not restrictively submit the issue, the award of damages granted here would otherwise have to be confirmed absent section 572.-19, subd. 1 grounds for vacation.

**3.** The Clinic acknowledges in its brief that section 572.08 "allows attack upon an arbitration agreement upon such grounds as exist at law or in equity for the revocation of any contract such as fraud in the inducement, *lack of consid-*

*eration* or contravention of public policy." (Emphasis added.)

**4.** Although the trial court should have made a determination of the arbitrability of the issue of lack of consideration, this court may make the determination based on the parties' written agreement. *U.S. Fidelity & Guaranty Co. v. Fruchtman,* 263 N.W.2d 66, 69, n. 3 (Minn. 1978).

ment to be a de novo determination of the issue of consideration based on the arbitration hearing record. The parties have made no claim that the evidence adduced before the arbitrators did not present all the relevant facts on the issue. There is no reason, therefore, to believe that the trial court would have reached a different conclusion at a hearing before arbitration. We will proceed to determine whether the trial court's conclusion was clearly erroneous.

■ 2. Was the covenant not to compete supported by adequate consideration? Parties may by mutual consent modify existing employment contracts without consideration. *Olson v. Penkert,* 252 Minn. 334, 347, 90 N.W.2d 193, 203 (1958). Where the modification adds a covenant not to compete, however, we will view the substituted contract as a separate noncompete agreement of the parties.

■ Covenants not to compete are agreements in partial restraint of trade, limiting as they do the right of a party to work and earn a livelihood. *Bennett v. Storz Broadcasting Co.,* 270 Minn. 525, 533, 134 N.W.2d 892, 898 (1965). Courts, including this one, look upon such contracts with disfavor and scrutinize them with care. *National Recruiters, Inc. v. Cashman,* 323 N.W.2d 736, 740 (Minn.1982). If the covenant is not made ancillary to the initial employment contract, it can be sustained only if it is supported by independent consideration. *Id.* The adequacy of consideration for restrictive covenants signed during an ongoing employment relationship will depend upon the facts of each case. The mere continuation of employment can be used to uphold coercive agreements, but the covenant must be bargained for and provide the employee with real advantages. *Davies & Davies Agency, Inc. v. Davies,* 298 N.W.2d 127, 130–31 (Minn.1980).

In *Davies,* we found consideration adequate where the employee who had signed the covenant obtained "substantial economic and professional benefits" and advanced to a position within that firm that would not have been open to him had he refused to sign the covenant. *Id.* 323 N.W.2d at 131. In *Josten's, Inc. v. National Computer Systems, Inc.,* 318 N.W.2d 691 (Minn.1982), we affirmed a trial court's finding that the covenant there was unenforceable for lack of consideration where no raises or promotions resulted and where other employees were not asked to sign.

In the case at bar, respondents argue that the panel of arbitrators and the trial court both determined that, although the covenant was intended to and did strengthen the Clinic, appellant benefited personally as an individual shareholder of the Clinic. Testimony at the arbitration hearing also stated that, because appellant had signed the agreement, his reputation as a "good guy" and "team player" was enhanced and he may have received more referrals from other doctors who had signed as well.

This reasoning is faulty, as the dissenting arbitrator explained in his opinion. First, to the extent that Dr. Freeman's equal-share compensation increased, all physicians received an equal increase, regardless of whether or not they had signed. The increase in Dr. Freeman's bookings was not clearly linked to his signing of the contract; his compensation from bookings had increased steadily since he was hired. Further, there was no testimony that the general public was even aware of these contracts; Dr. Freeman's community reputation was thus unaffected. Finally, the names of signers and nonsigners were not common knowledge so that doctors would even be aware of which doctors were "good guys" deserving of referrals.

■ We conclude that the covenant signed by Dr. Freeman was not bargained for. Absolutely no distinction was made between signers and nonsigners. Indirect benefit to an employee via benefit to the corporation of which he is a shareholder cannot be sufficient consideration where other shareholders who have not signed received the same benefit. The covenant is unenforceable for lack of consideration. The trial court's conclusion to the contrary is clearly erroneous.

Dr. Freeman also argues that the covenant not to compete, even if valid, is unen-

forceable by way of injunctive relief because it is against public policy. We do not reach this issue, having already found the covenant unenforceable for lack of consideration. We note, however, that the Judicial Council of the American Medical Association discourages restrictive covenants as not being in the public interest and that three states have refused to grant injunctive relief in noncompetition cases involving certain medical specialists. *Damsey v. Mankowitz,* 339 So.2d 282 (Fla.App.1976); *Ellis v. McDaniel,* 95 Nev. 455, 596 P.2d 222 (1979); *New Castle Orthopedic Associates v. Burns,* 481 Pa. 460, 392 A.2d 1383 (1978).

Reversed.

YETKA, Justice (dissenting).

I respectfully dissent. I simply cannot accept the argument that there was lack of consideration for Dr. Freeman to sign the non-competition clause in his contract.

One must look at the unique services that The Duluth Clinic provides, not only for the City of Duluth, but for the entire region of Northern Minnesota, Wisconsin, and Michigan, to determine the existence of consideration. A tremendous expenditure of capital is necessary to recruit doctors to come into a distressed economic area with its unique climate. The clinic must then provide equipment and buildings and encourage hospital construction to meet the standards required by the doctors.

Eighty percent of the doctors in the Duluth Clinic signed the non-competition provision. There was thus a mutuality of promises, which has always been held to be an adequate consideration in contract cases. Moreover, there was a dramatic increase in Dr. Freeman's compensation following his signing of the agreement. How is it possible to argue that the clinic as a whole was not strengthened by the covenant? The vast majority of the staff knew that, after they signed the non-competition clause, their colleagues would be there to share both in the expense and the income from the expenditures of capital necessary to maintain the clinic. Their colleagues thereafter could not simply come into the clinic,

become familiar with it, build a patient load, and then leave to go out and build a private practice at The Duluth Clinic's expense. After Dr. Freeman signed the new contract with the non-competition clause, the clinic committed itself to expend more money in expanding the medical equipment Dr. Freeman expressed a desire to have.

Significantly, the arbitrators found consideration. We weaken the whole scheme of arbitration by interfering and making our own findings of fact when arbitrators have decided otherwise. Furthermore, we held in the *Atcas v. Credit Clearing Corp. of America,* 292 Minn. 334, 197 N.W.2d 448 (1972), that, to avoid arbitration, one must void the contract. Here, Dr. Freeman affirmed the contract four times in his complaint and earlier had sought arbitration himself.

I thus would affirm the trial court in upholding the findings of the three arbitrators, but would remand for imposition of the damages the panel sought to impose. If the district court upheld the findings of the arbitrators, certainly it was compelled to uphold the award of damages as well.

KELLEY, Justice (dissenting).

I join in the dissent of Justice Yetka.