Herbert M. BOND, Appellant,
Respondent,

v.

Lynn L. CHARLSON, and Durance
Corporation, Respondent,
Appellant,

and

Beverly G. Scott Charlson, Defendant.

Nos. C8–82–1501, C0–83–305.

Supreme Court of Minnesota.

May 10, 1985.

Rehearing Denied June 27, 1985.

Gerald T. Laurie, Douglas J. Shiell, Harold J. Kinney, Minneapolis, for Bond.

Joe A. Walters, William E. Flynn, Minneapolis, Trammell, Rand, Nathan & Lincoln,

Washington, D.C., for Lynn Charlson and Durance Corp.

Michael Young, Chaska, for Beverly G. Scott Charlson.

COYNE, Justice.

This complex commercial litigation involves claims of breach of a contract of employment, common law fraud inducing plaintiff to enter into the contract, securities fraud in violation of section 80A.01 of the Minnesota Securities Act, and breach of a majority shareholder's fiduciary obligations to a minority shareholder. The jury found that there had been breach of an employment contract and of fiduciary obligations and that one individual defendant had been guilty of securities fraud but not common law fraud, and it found that the plaintiff had sustained damages aggregating more than $1 million. On the ground, however, that the case had been submitted on erroneous instructions, the trial court granted a new trial. The plaintiff appeals from that order, and defendants Lynn L. Charlson and Durance Corporation seek review of that portion of the order denying their motion for judgment notwithstanding the verdict. We affirm.

Plaintiff Herbert M. Bond is a chemical engineer who is responsible for numerous patents in the field of polymer science. For approximately nine years Bond was employed by Buckbee-Mears Corporation as vice president in charge of research and development. In 1977, the election of a new president of Buckbee-Mears and a subsequent corporate reorganization involving severe cutbacks in research and development led to the termination of Bond's position. His work at Buckbee-Mears came to an end in April 1977 although Bond remained on the payroll until September 1977 when his pension vested.

In 1973, while employed by Buckbee-Mears, Bond had conceived a polymerization process utilizing electrical energy rather than a chemical process to create a thin

film covering on very small objects. Buckbee-Mears released its rights in the polymerization process to Bond, and Bond sought to patent the process—but without success.[1] In 1974 Bond entered into an option arrangement with Xerox Corporation, for which Xerox paid Bond $50,000. After a year of testing, Xerox concluded that the process did not produce consistent results and declined to exercise its option. In January of 1975, Bond sought to interest Lynn Charlson in the process. For a time the parties explored the possibility of purchase by Durance Corporation, but Charlson declined to pay Bond's proposed price, and the discussions were discontinued.

About forty years ago Lynn L. Charlson had founded Char-Lynn Corporation, a highly successful company engaged in the development and manufacture of pneumatic and hydraulic power devices. In 1970 Charlson sold Char-Lynn to Eaton Corporation for $26 million, paid in cash and Eaton stock. Shortly thereafter, in 1971, Charlson formed Durance Corporation to engage in research and development of new products. Since 1973 Durance has been operated as a subchapter S corporation. Until sometime in 1977 Charlson, its president, held 90 percent of the shares of Durance; and his wife, Beverly Scott Charlson, held the office of vice president and owned the remaining shares. The corporate income tax returns for the fiscal years 1971 through 1977 disclose that Durance had neither receipts nor sales revenue during the first six years of its existence; its accumulated deficit, however, was in excess of $1.5 million.[2] Because Durance was founded and maintained almost entirely by his capital contributions, its subchapter S status allowed Charlson to deduct corporate losses on his personal income tax returns.

In January of 1977, shortly after Bond learned that his position at Buckbee-Mears was to be terminated, Bond wrote to Charlson, said that he was contemplating an early retirement, and informed Charlson of his availability for consulting or full time work on April 1st. When the two men met about two weeks later, Bond spoke of his desire to become a chief executive of a corporation of which he was partial owner. Charlson indicated an interest in Bond's employment by Durance, described the nature of the corporation to him, and told him to procure a Dun and Bradstreet report to ascertain its financial condition.

The next time the parties met they discussed a Dun and Bradstreet report on Durance dated June 22, 1976. The report stated that Charlson had started Durance in 1970 with $26 million received from the sale of Char-Lynn. According to Bond, Charlson replied to Bond's inquiry by saying it was more like $40 million in 1977.

From January through April the parties met about every two weeks. Bond avers that in the course of their meetings Charlson represented that Durance was a business for profit, that funding would be provided for the contemplated business, that an air motor would be developed and would produce substantial revenues, and that Bond would be a millionaire if he joined Durance.

On April 20, 1977, the parties executed a document which had been drafted by Charlson and was entitled "Durance Proposal to Herb Bond." Bond asserts that this document was intended to serve as his employment contract. Under the terms of the proposal, effective April 21, 1977, Bond was (1) to acquire 750 shares of Durance, representing 10 percent of the outstanding

---

1. Three separate patent applications were filed in the United States Patent and Trademark Office, each of which was rejected more than once. The last of these was denominated a "final rejection." A patent expert called by Bond testified that final rejections are not unusual and that it often means only that additional research is required for a successful application. Another expert noted, however, that the patent examiner had appended a comment which the expert considered unusual: that it was doubtful that there would ever be patentable subject matter found in the application.

2. By June 30, 1979, the accumulated deficit was in excess of $2 million.

shares,[3] in exchange for "one patent"; (2) to become the executive vice president and a director of Durance; and (3) to seek to develop patentable ideas having a meaningful economic value, to acquire patents, and to secure licensing for the most profitable use of all patents. The proposal also provided that Bond's salary should be the same as at Buckbee-Mears and that payment should begin when his salary at Buckbee-Mears terminated. The document stated, "We will presume this to be a successful, continuing, and permanent arrangement, and every effort will be made to make it so", but it also provided that a "termination of the arrangement would be made by re-exchange of the same patent and same stock."

Charlson's contention throughout these proceedings has been that the proposal was not intended to be the actual contract but was merely to serve as the basis for a final agreement, which his lawyers would prepare. Charlson also asserts that the proposal was designed to reflect the parties' desire to maintain the arrangement as long as it was fruitful but that a contract for permanent employment was not intended.

Following the execution of the proposal, the parties engaged in further negotiations. On May 17 and 18, 1977, Bond, Charlson, and Durance's attorneys and accountant met. Bond received an unaudited corporate balance sheet showing assets of $242,172.64 and an accumulated deficit of $1,490,501.13 at March 31, 1977. Bond claims that when he asked Charlson about the deficits, Charlson assured him that Charlson would adequately fund the corporate endeavors.

Adam Zartaga, the corporate accountant, discussed the significance of Durance's subchapter S status with Bond. Zartaga testified that he informed Bond that as a shareholder, he would be entitled to deduct a portion of corporate losses on his personal income tax return and that the Internal Revenue Service required Bond's consent to the subchapter S status before the close of Durance's fiscal year on June 30, 1977.

Bond consented, and for the years 1977, 1978, and 1979, Bond claimed deductions for corporate losses aggregating $26,388.

In a letter dated May 19th, the day after the meeting, Bond informed Charlson that he considered the April 20th proposal reflective of their agreement after two months of negotiations. The letter continued, "If a copy could become part of the Minutes of the Stockholder Meeting of April 28th, I would be satisfied with that as our agreement for my association as a shareholder, officer and employee of Durance." In the remainder of the letter Bond posed questions, stated his position, and made suggestions regarding various terms of his employment and the provision for repurchase of the Durance shares.

On that same day local counsel for Durance recommended by letter that there be formal documentation of the Bond-Durance agreement, and he also advised Charlson to make certain Bond understood that there was no Bond-Durance contract until it was formally executed.

On July 22, 1977, Bond wrote to Hans Nathan, Durance's Washington, D.C., counsel, who was responsible for drafting the formal agreement, advising that he and Charlson had agreed on a two-year term of employment. He expressed a desire to examine the "modified contract" as soon as possible. July 22nd was also the date on which Bond assigned the polymerization process to Durance. On August 25th Bond again wrote to Nathan, requesting Nathan "to clarify that the term of employment is for two years". He went on to state:

I would appreciate having the agreement finished, if at all possible, prior to August 30th. I will be on vacation for the first two weeks of September and out of the country. Since I start paid employment with Durance on September 15th, we would need the contract signed prior to my leaving.

On September 26, 1977, a document entitled "Agreement" and dated April 28, 1977 was executed by Bond and by Charlson as

---

**3.** Only 4,000 shares of Durance Corporation were then outstanding.

president of Durance Corporation. Charlson claims the agreement was backdated so that Bond could take advantage of the subchapter S loss deductions for the fiscal year ending June 30, 1977. Bond, however, contends that he had been working for Durance since April and that the negotiations which took place from May to September and the execution of the agreement in September were the result of pressure exerted by Charlson. Bond testified he had encountered substantial financial difficulties that summer and entered into the September agreement only because Charlson threatened to breach the April proposal.

The September 26th agreement is basically the same as the April 20th proposal although Nathan, the drafter, explained that he had also filled in some gaps in the earlier document. In consideration of his services and his polymerization process, Bond was to receive ten percent of the shares of Durance, a position on its board of directors and as its executive vice president, and a salary of $50,000 per annum. In addition to these terms, however, the agreement provided for salary adjustments for inflation and set a term of employment of two and one-half years, the term thereafter to continue from year to year unless terminated by either party by written notice given 30 days before expiration of the term or extended term. The agreement also provided for the escrow of the Durance share certificate, endorsed in blank, and a reassignment of rights in the polymerization process until October 28, 1979 or any earlier termination of Bond's employment. If Bond's employment should continue beyond the original term, the certificate was to be delivered to him and the reassignment of the process was to be destroyed. If, however, Bond's employment did not continue beyond October 28, 1979, the shares were to be returned to the company and the process returned to Bond.[4] Finally, the agreement contained a clause

merging therein all prior negotiations and agreements, either written or oral.

By written notice in accordance with the September agreement, Bond's employment at Durance terminated on October 28, 1979. The escrow agents returned the stock certificate to Durance and delivered reassignment of the rights to the polymerization process to Bond. Shortly thereafter, Bond instituted this action against Lynn L. Charlson, Beverly Scott Charlson, and Durance Corporation alleging breach of his employment contract, fraud, security fraud in violation of section 80A.01 of the Minnesota Securities Act, breach of fiduciary obligations, and emotional distress, and seeking both compensatory and punitive damages. The defendants denied these claims and asserted counterclaims.

The principal issue litigated was whether the April 20th "Proposal" or the September 28th "Agreement" constituted Bond's employment contract. Bond contended that the April 20th document was the contract, that it provided for permanent employment, and that, therefore, his termination from employment constituted a breach. He also asserted that in the two years of his employment Charlson never provided the promised funding for the various projects, and he claimed that the major purpose of Durance Corporation was to provide Charlson a tax shelter.

At the close of a month long trial the matter was submitted to the jury in the form of 20 special verdicts. After four days of deliberation, the jury made these findings:

a. Charlson and Bond intended the April 20th proposal to be a valid contract; Durance breached the contract and Bond sustained damages of $635,578 as a result of the breach.

b. The value of Bond's polymerization process on April 20, 1977 was $500,-000; on October 28, 1979, it had no value.

---

4. The agreement also contained a provision for allocation between Bond and Durance of royalties or license fees collected after reassignment

until Durance was reimbursed for development costs which it had incurred.

c. The agreement executed September 26, 1977, was not a valid contract between Bond and Durance.

d. Neither Charlson nor Bond fraudulently induced the other to enter into the April proposal, but Charlson did violate the Minnesota Securities Law during the course of negotiations leading up to the April 20, 1977 contract and Bond sustained $500,000 damages as a result of the violation.

e. Charlson, as the controlling shareholder, operated Durance solely for his own benefit to the adverse effect of the corporation and the minority shareholders, and Bond sustained damages of $635,578 by reason of that action.

f. There was no intentional infliction of emotional distress and no punitive damages were assessed.

g. Mrs. Charlson was not guilty either of fraud or any securities violation.

Concluding that its instruction that a violation of the securities law could not be waived was erroneous, the district court granted the motion of defendants Charlson and Durance for a new trial. We agree that the instructions were misleading and that a new trial is required with respect to the claims against Lynn L. Charlson and Durance Corporation except for claims of intentional infliction of emotional distress and for punitive damages.

The crux of the lawsuit as well as the source of the problems with the instructions lies in the first two questions of the special verdict:

1. Did Lynn L. Charlson and Herbert M. Bond intend the April 20, 1977 document to be a contract between Herbert M. Bond and Durance Corporation?

2. If you answer "Yes" to Question Number 1, answer this question: Was the document dated April 28, 1977, and signed September 26, 1977, a valid contract between Herbert M. Bond and Durance Corporation?

The court instructed the jury that if they answered the first question "Yes" and the second question "No", the April document was the contract in the case. If they answered the first question "No" or if they answered both questions in the affirmative, the September document was the contract. Inasmuch as the jury was required to determine this fundamental issue on the basis of two questions framed in terms which are not parallel—the question regarding the April 20th document is directed to the *intent* of the parties while the question regarding the September 26th document goes to its *validity* as a contract—it is apparent that the special verdict should be reframed.

After reading the first question regarding the April proposal to the jury, the court instructed the jury concerning the nature and the making of a contract. Then he read the second question about the September agreement. After referring the jury to the definition of a contract given in connection with the first question, however, he instructed the jury that as to the second question they should consider "whether there are any obstacles to the formation of a true contract."

 The court described to the jury four "obstacles" to the formation of a contract: duress, fraud, lack of consideration, and violation of securities law. While Bond complains that he was under severe personal economic pressure during the summer of 1977 and that Charlson threatened not to abide by the April 20th proposal, the limitation of alternatives imposed by one's own financial problems does not constitute duress. That an employee is motivated by economic stress to enter into an employment contract with an employer who has superior bargaining power does not render the employee's consent to the contract, however reluctantly given, ineffective. Duress is available as a defense to a contract only when agreement is coerced by physical force or unlawful threats. *Wise v. Midtown Motors, Inc.*, 231 Minn. 46, 51, 42 N.W.2d 404, 407 (1950). The record here is devoid of any evidence of coercion. Since we do not know on which of the four "ob-

stacles" the jury based its determination that the September agreement was not a valid contract, instructing the jury that duress was available as a defense justified the order granting a new trial.

The court then set out the various elements of the second obstacle—common law fraud. He also properly instructed that if a party who asserts fraud performs a contract and receives benefits from it after he determines the existence of fraud, he has waived the fraud or ratified the contract.

 Next, the court told the jury that the third possible obstacle to the formation of a contract was lack of consideration, and he instructed that when the parties operating under an existing contract enter into a new contract, the second contract must provide some more than nominal advantage to the person sought to be bound than he would have received under the original contract. Apart from the possibility that the instruction implied that the September agreement was valid only if Bond gained some significant advantage without surrendering anything in return, lack of consideration was not an issue with respect to the September agreement. Parties may by mutual consent modify existing employment contracts without consideration. *Freeman v. Duluth Clinic, Ltd.,* 334 N.W.2d 626, 630 (Minn.1983); *Olson v. Penkert,* 252 Minn. 334, 347, 90 N.W.2d 193, 203 (1958). The substitution of the new contract for the old is sufficient consideration. *Wilson v. Hayes,* 40 Minn. 531, 540, 42 N.W. 467, 471 (1889).

 Finally, the court instructed the jury that a violation of Minn.Stat. § 80A.01 (1984)[5] would prevent the formation of a contract. He also told the jury that a violation of the securities act could not be waived.

We agree that this instruction was fundamentally erroneous. In the first place a violation of the anti-fraud provisions of the securities act does not prevent the formation of a contract. The statute recognizes the existence of a contract; but while preserving any rights traditionally available to the victim of fraud, such as restitution or rescission, the statute precludes the violator from enforcing the contract and subjects him to liability for the damages sustained by reason of the violation. Minn. Stat. § 80A.23, subds. 2, 9, 11 (1984). Were a securities violation to prevent the formation of a contract, then the violation which the jury found occurred during the course of the negotiations leading up to the signing of the April 20th proposal would have prevented the formation of a contract at that time as well regardless whether or not the parties intended the proposal to be a contract.

 The fundamental purpose of "Blue Sky Laws" is to protect the investing public from fraudulent sales of securities. To effect this purpose Minn.Stat. § 80A.01 (1984) makes it unlawful to misrepresent or omit any material fact or to use any scheme or engage in any act to defraud or deceive any person in connection with the offer, sale, or purchase of a security. Nevertheless, because the purpose of the act is not served by permitting one who loses his innocence to await the outcome of his investment before invoking the securities act, some courts have recognized waiver as a defense to a securities law violation. *Royal Air Properties, Inc. v. Smith,* 312 F.2d 210, 213–14 (9th Cir.1962); *William's Delight Corp. v. Harris,* 87 Mich.App. 202, 273 N.W.2d 911 (1978). This court has held that equitable estoppel is a defense against the claim of corporate investors who have actively participated in the management of the business and who made no attempt to

5. It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:
 (a) to employ any device, scheme, or artifice to defraud;
 (b) To make any untrue statement of a material fact or to omit to state material facts neces-

sary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
 (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.
Minn.Stat. § 80A.01 (1984).

rescind their purchase of unregistered securities until after the business failed. *Logan v. Panuska*, 293 N.W.2d 359 (Minn. 1980). Similarly, in *McCauley v. Michael*, 256 N.W.2d 491 (Minn.1977), a purchaser who had full knowledge of the illegality of the securities transaction in which he participated was barred from recovery under the Minnesota Securities Act.

On the record before us the jury could have found, had the question been properly framed, that even if Charlson violated section 80A.01, Bond nevertheless signed the September 28th agreement and engaged in its performance with knowledge of the facts which constituted the violation. The election to perform and to reap the benefits of an illegal contract despite knowledge of the facts invokes the bar of Minn.Stat. § 80A.23, subd. 9 (1984):

> No person who has made or engaged in the performance of any contract in violation of any provision of this section or any rules or order hereunder or has acquired any purported rights under any such contract with knowledge of the facts by reason of which its making or performance was in violation may base any suit on such violation under the contract.

■ Despite frequent references to "waiver" of common law fraud, we are reluctant to characterize as "waiver" the making or performance of a contract for the purchase or sale of securities with knowledge of the facts, lest the principle be confused with the contractual waiver declared void by Minn.Stat. § 80A.23, subd. 10 (1984).[6] Civil liability for securities fraud is measured by the actual harm caused by the false and misleading information. Minn.Stat. § 80A.23, subd. 2 (1984). *Berg v. Xerxes-Southdale Office Building Co.*, 290 N.W.2d 612, 615 (Minn. 1980). The failure to prove actual damages is fatal to the claim. *Austin v. Loftsgaarden*, 675 F.2d 168, 180 (8th Cir.1982). Minnesota long ago recognized that a party to

an executory contract, who discovers fraud prior to its performance, may not go forward with performance of the contract and then sue for damages. The fraud cannot be said to have caused the damages accruing from performance after discovery of the fraud. *Defiel v. Rosenberg*, 144 Minn. 166, 174 N.W. 838 (1919). Moreover, since that principle has been codified in subdivision 9 of section 80A.23, it seems preferable to cast the jury instruction in terms of the statutory preclusion.

Inasmuch as the evidence did not raise fact questions with respect to either duress or lack of consideration, the agreement signed on September 26, 1977, should have been taken as a contract. On the record before us, however, it was for the jury to determine whether or not that contract was tainted either by common law fraud or by a violation of the securities act. If the jury found that Charlson had engaged in common law fraud or had violated the antifraud provision of the securities act, the next question should have been whether or not Bond made or performed the September agreement with knowledge of the facts which constituted fraud or a violation of the securities act. If the jury found neither fraud nor securities violation or if they found that there had been common law or securities fraud but that Bond had made or performed the September agreement with knowledge of the facts, then Bond would have been bound by the September agreement and could not have recovered damages for fraud or violation of the securities act. If, on the other hand, the jury had found that Bond had performed the September contract without knowledge of the fraud or violation, then Bond could have rescinded the September agreement. Then, and only then, would the jury have had reason to determine whether or not the April proposal was intended to be the Bond-Durance employment contract and, if so, whether or not it was a lifetime contract which Durance had breached.

---

**6.** Minn.Stat. § 80A.23, subd. 10 (1984) provides: Any condition, stipulation or provision binding any person to waive compliance with any provision of sections 80A.01 to 80A.31 or any rule or order hereunder in the purchase or sale of any security is void.

Furthermore, the form of the special verdict permitted some duplication of damages. The jury found that the polymerization process was worth $500,000 on April 20, 1977, and had no value on October 28, 1979. Having been instructed that the damages for a violation of the securities law is the difference between what the claiming party parted with and what he received, the jury declared that Bond had sustained damages of $500,000 as a result of Charlson's violation of the Minnesota Securities Law during the course of the negotiations leading up to the signing of the April 20th proposal. Bond contends, however, that the assignment to Durance of his rights in the polymerization process constituted the consideration for lifetime employment. Based on an instruction that damages for breach of a contract of permanent employment included not only unpaid wages and any loss of future salary or earnings from October 28, 1979, but also the difference, if any, in the value of the stock of Durance Corporation from that promised, the jury determined that Bond had sustained damages of $635,578 as a result of the breach. Combining these two measures of damages resulted in Bond's recovering not only the benefit of the contract as if it had been fully performed ($635,578) but also the consideration he provided (the rights to the process, valued at $500,000)—i.e., damages based on both breach of contract and rescission. Given the findings that Durance had breached a contract memorialized in the April 20th proposal and that there had been a violation of the securities act, Bond was no doubt entitled to recover damages based on either breach of contract or rescission—but not on both.

Finally, although the claim that Charlson, as the majority shareholder, breached his fiduciary obligations to the minority shareholders is a separate cause of action, that claim and the instructions with respect to damages for breach of fiduciary obligation were inextricably interwoven with and dependent upon the jury's determination with respect to the employ-ment contract. Hence, that claim, too, must be retried.

Affirmed and remanded for a new trial consistent with this decision.