**SANBORN MANUFACTURING COMPANY, Respondent,**

v.

**Charles CURRIE, Appellant,**

**Quincy Compression, a Division of Coltec Industries, Inc., Defendant.**

No. C1–93–301.

Court of Appeals of Minnesota.

May 25, 1993.

Richard A. Ross, Cynthia A. Jokela, Fredrickson & Byron, P.C., Minneapolis, for respondent.

Kay Nord Hunt, J. Christopher Cuneo, Lommen, Nelson, Cole & Stageberg, P.A., Minneapolis, for appellant.

Considered and decided by CRIPPEN, P.J., and NORTON and DAVIES, JJ.

## OPINION

CRIPPEN, Judge.

Appellant Charles Currie challenges the trial court's temporary injunction prohibiting him from breaching a noncompetition agreement. Appellant argues that respondent Sanborn Manufacturing Company failed to show irreparable harm and a likelihood of success on the merits, and thus it was not entitled to a temporary injunction. We agree that Sanborn failed to show any likelihood of success on the merits and we reverse.

## FACTS

Appellant Charles Currie worked as a marketing manager for respondent Sanborn Manufacturing Company for more than four years. Before working for Sanborn, Currie had been employed in a similar capacity at Ingersoll–Rand in North Carolina. Currie stated that he and Sanborn reached an agreement on the terms of his employment in April 1988, and at that time there was no discussion of a noncompetition agreement. Sanborn has not disputed this statement. Sanborn sent Currie a written offer of employment dated May 2, 1988, which does not mention a noncompetition agreement. The written offer was for a marketing manager position to begin May 24, 1988. The compensation package included $43,000 in base pay, a bonus program, relocation expenses, a 401K plan, two weeks of vacation, and Sanborn's current family health, dental and disability program. Currie accepted the offer, quit his job with Ingersoll–Rand and signed a purchase agreement to sell his home.

On May 23, 1988, Currie flew to Minnesota to fill out employment forms. At that

time he was presented with a noncompetition agreement dated May 24, 1988, which stated that consideration for the agreement included Currie's "employment, continued employment, promotion, increase in compensation, and other benefits now or hereafter paid or made available." It was accompanied by a cover sheet, which stated that as consideration for Currie's execution of the agreement, he would receive the compensation package he had already accepted: $43,000 in base pay, the profit-sharing, pension, medical and hospitalization plan, and two weeks of vacation. Currie expressed concern about signing the agreement, noting that he had never been asked to sign such an agreement before. He decided to sign it, however, because he had already quit his job and sold his home, and thus he "didn't really have any choices at the time."

Currie stated that he had been recruited by Sanborn's vice president of marketing, Tony Everette, who had previously worked at Ingersoll-Rand. During negotiations, Currie was told that as Sanborn's marketing manager he would do essentially the same things that he had done as a technical product manager at Ingersoll-Rand, including product line management, new product definition and introduction, market planning, pricing, and product presentation. Everette stated that "in his capacity as Marketing Manager," Currie obtained confidential information about Sanborn's product specifications, pricing and cost structure, merchandising and packaging decisions, marketing and strategic planning decisions, research and development efforts, and its customer base.

Currie was never promoted at Sanborn. However, Everette states that Currie's advancement in the company was evident because he was given supervisory responsibilities and his income increased by $11,600. Sanborn has not refuted Currie's statement that he received excellent performance evaluations at Sanborn.

In 1988, Currie received an offer from Quincy Compression to become its National Accounts Manager, a position involving marketing and selling Quincy's products.

Quincy manufactures and sells air compressors primarily to the industrial and commercial markets. Sanborn manufactures and sells air compressors primarily to the consumer market. When Currie gave notice to Sanborn, he was informed that his acceptance of the position at Quincy constituted a breach of the noncompetition agreement. When he decided to take the position anyway, Sanborn obtained a preliminary injunction. This appeal followed.

## ISSUE

Was it error to issue a temporary injunction in the circumstances of this case respecting whether it was likely that Sanborn would prevail on the merits?

## ANALYSIS

A trial court may grant a temporary injunction if the party seeking it establishes that there is no adequate remedy at law and that denial of the injunction will result in irreparable injury. *Cherne Indus., Inc. v. Grounds & Assocs., Inc.*, 278 N.W.2d 81, 92 (Minn.1979). The purpose of a temporary injunction is to preserve the status quo until a trial can be held on the merits. *Pickerign v. Pasco Mktg., Inc.*, 303 Minn. 442, 446, 228 N.W.2d 562, 565 (1975). When reviewing a trial court's decision on a preliminary injunction, we are to consider five factors: (1) the relationship of the parties; (2) the relative harm to the parties if the injunction is or is not granted; (3) the likelihood of success on the merits; (4) public policies expressed in statutes; and (5) the administrative burdens in supervising and enforcing the decree. *Dahlberg Bros., Inc. v. Ford Motor Co.*, 272 Minn. 264, 274–75, 137 N.W.2d 314, 321–22 (1965). This court will affirm the trial court's decision absent a clear abuse of discretion. *Id.* at 274, 137 N.W.2d at 321; *Cherne*, 278 N.W.2d at 91. In this case only two of the *Dahlberg* factors are in dispute: the harm to the parties and the likelihood of success on the merits. Because we view the latter consideration as dispositive, our opinion is confined to that subject.

Appellant argues that the trial court erred in granting the injunction because

Sanborn is unlikely to prevail on the merits. He contends the noncompetition agreement is not supported by independent consideration and is overly broad. Because the noncompetition agreement must fail for lack of consideration, we need not address the overbreadth issue.

◼◼◼ Noncompetition agreements are not favored at law because they partially restrain trade. *See National Recruiters, Inc. v. Cashman*, 323 N.W.2d 736, 740 (Minn.1982). These agreements are invalid unless bargained for and supported by adequate consideration. *Id.* Where a noncompetition agreement is not ancillary to an employment contract, it must be supported by independent consideration to be enforceable. *Id.* This requirement reflects the fact that employers and employees have unequal bargaining power. When the employer fails to inform prospective employees of noncompetition agreements until after they have accepted jobs, the employer "takes undue advantage of the inequality between the parties." *Id.* at 741.

◼◼◼ Sanborn has not refuted the fact that Currie accepted the offer of employment before Sanborn asked him to sign the noncompetition agreement. Sanborn argues that its only obligation was to execute the noncompetition agreement before Currie began work. That argument is not supported by law. *See id.* Currie and Sanborn had an oral employment agreement before they executed the noncompetition agreement, and thus independent consideration for the noncompetition agreement was required. *Id.*

◼◼◼ Sanborn asserts that Currie received consideration for the noncompetition agreement over the course of his employment. Proof of continued employment is not enough to show sufficient consideration for a noncompetition agreement. *Id.* at 740–41 (distinguishing *Davies & Davies Agency, Inc. v. Davies*, 298 N.W.2d 127, 131 (Minn.1980), where employee obtained "substantial economic and professional benefits" after signing a contract containing a noncompetition clause); *cf. Freeman v. Duluth Clinic, Ltd*, 334 N.W.2d 626, 630 (Minn.1983). Whether independent consid-

eration is adequate in an ongoing relationship depends on the facts of the case. *Davies*, 298 N.W.2d at 130. There is no independent consideration unless the employer provides real benefits beyond those already obtained by the employee in a previous contract. *Cashman*, 323 N.W.2d at 741 (training did not constitute independent consideration for noncompetition agreement, because it was part of a prior employment agreement).

In this case, there is no difference between what Currie was promised in his initial employment contract and what he received in the course of his employment. In the initial employment agreement, Currie accepted a marketing manager position in which he would perform essentially the same duties he had performed in his previous position at another company. In exchange for his performance, he was to receive a compensation package including base pay, bonuses, and other benefits. There was no dispute that Currie fulfilled his obligations.

◼◼◼ Sanborn contends Currie received independent consideration because he was progressing up in the company, his salary increased by $11,600, and he was given supervisory responsibilities. There is no evidence that Currie was promoted, and no evidence that the increase in salary and supervisory duties were attributable to anything other than the performance that was expected of him under the initial employment agreement. Employees commonly receive raises when they perform well, and there was no evidence suggesting that Currie's raises were tied to the noncompetition agreement.

◼◼◼ We have observed that Sanborn properly showed that it would suffer irreparable harm if its application for an injunction were denied. Trial courts have the discretion to balance the factors of irreparable harm and likelihood of success on the merits. Where plaintiffs make a strong showing of irreparable harm, but a doubtful showing that they are likely to win the case, trial courts may properly decide to grant an injunction to preserve the status

quo until trial. *Dahlberg*, 272 Minn. at 275 n. 13, 137 N.W.2d at 321 n. 13; *see also* Dan B. Dobbs, *Dobbs Law of Remedies*, § 2.11(2) (2d ed. 1993). But the prospect for this balancing of considerations does not exist in the circumstances here, where Sanborn has shown no likelihood it will win this case.

## DECISION

Sanborn provided no evidence of independent consideration to support the noncompetition agreement and thus showed no likelihood of winning this case on the merits. We reverse the trial court's grant of a temporary injunction.

**Reversed.**