DAVIES & DAVIES AGENCY, INC., Appellant,

v.

Richard H. DAVIES, Respondent,

and

Richard H. DAVIES, Plaintiff,

v.

DAVIES & DAVIES AGENCY, INC. and Everett W. Davies, Defendants,

and

DAVIES & DAVIES AGENCY, INC., et al., Appellants,

v.

Robert J. BUCKINGHAM, et al., Respondents.

Nos. 49594, 50016.

Supreme Court of Minnesota.

Oct. 17, 1980.

Popham, Haik, Schnobrich, Kaufman & Doty, Wayne G. Popham and David A. Jones, Minneapolis, for appellants.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan and James F. Roegge, Minneapolis, for respondents.

Heard before OTIS, ROGOSHESKE, and SCOTT, JJ., and considered and decided by the court en banc.

WAHL, Justice.

Two cases have been consolidated for purposes of this appeal. They arise from actions commenced by plaintiff Davies & Davies Agency, Inc. ("the agency") against two of its former employees for, *inter alia*, breach of noncompetition agreements between the agency and the two employees. Both actions were tried in the Hennepin County District Court without a jury. In the agency's suit against defendant Richard Davies the trial court held that the noncompetition agreement between plaintiff and Richard Davies was valid but its terms were

overbroad, and modified the terms accordingly. The court also concluded that neither party was entitled to damages. Plaintiff appeals from this judgment.

In the agency's action against Robert J. Buckingham a different trial court concluded that the noncompetition agreement entered into by Mr. Buckingham and plaintiff was without consideration and therefore invalid. Plaintiff was denied damages and injunctive relief for breach of the agreement and was also denied any relief on its claims of defendant's disloyalty and misrepresentation. Plaintiff also appeals from this judgment.

Davies & Davies Agency is an insurance agency whose stock is owned solely by Everett W. Davies, its president. Richard Davies, the eldest son of Everett Davies, began working for the agency in June 1967. He was 20 years old at the time and had completed three years of study at the University of Minnesota. Everett Davies hoped at the time that Richard, and possibly his younger brothers, would eventually take over the agency. At the outset of his employment, Richard did general office and clerical work. On October 24, 1967, approximately four months after he began work and six days before his 21st birthday, he was presented with and executed an employment and noncompetition agreement. The agreement precluded Richard, upon termination of his employment with the agency for any reason, from engaging in the insurance business for a period of five years within a 50–mile radius of Minneapolis, St. Paul, or Duluth. All employees of the agency were required to sign a similar agreement.

Richard had not been required to sign the noncompetition agreement at an earlier date because Everett Davies was under the mistaken impression that an agreement signed by a minor is void. Everett Davies stated that Richard would not have been allowed to expand his duties at the agency and would not have been supported in his applications for insurance licensing if he had not signed the agreement.

Over a period of years, Richard was trained and acquired expertise in the sale of probate and court bonds, a specialty which comprised a significant portion of the agency's business. As Richard was entrusted with greater responsibility for the agency's clients concerning bounds, Everett Davies phased himself out of that part of the business. By 1972, Richard was in charge of the agency's bond business and was often the exclusive contact between the agency and its bond customers.

Conflict between Everett and Richard Davies concerning the agency's operations and their respective positions within the agency began and steadily increased in the last few years of Richard's employment. On Richard's behalf, it was asserted that morale was poor among all the employees, that Everett Davies generally ran the business as an autocrat, that there was disputes between Everett and employees about credit for production and compensation, and that Richard Davies was often put in the position of an intermediary between his father and other employees. At one point, Everett changed the locks to the office and did not provide keys to his employees.

On the other side, there was testimony from Richard himself that he used various kinds of threats to manipulate his father. He announced that he was quitting on several occasions, but then continued working. On one occasion, Richard smashed equipment in his office. He removed a file containing information about the agency's customers for over a week. According to Everett's testimony, Richard stated at a meeting in October 1977 that unless his compensation and other demands were met by the agency, he would be the most vindictive person in the city of Minneapolis.

The mutual mistrust between Everett and Richard and the continuing deterioration of their working relationship led Richard to announce his intention of resigning from the agency. Everett reminded Richard of his obligations under the noncompetition agreement but was unable to obtain from Richard any information about his future plans. On January 13, 1978, Richard

notified Everett that he was leaving the agency on January 31. Everett replied that Richard was relieved of his duties as of January 15.

After he was relieved of his duties, Richard contacted many of the attorneys who had been his clients. He was in the Hennepin County Government Center on January 16 talking to attorneys. There is conflicting testimony as to whether Richard systematically steered customers he had serviced at the agency to the Pat Thomas Agency, a competitor, or whether Richard merely explained his situation to attorneys who were also personal friends, and occasionally suggested the Thomas Agency to attorneys who contacted him personally for bonds and did not wish to obtain bonds through Davies & Davies. At the time of trial, Richard had not accepted employment with any other insurance agency.

The following issues are presented for our determination in the Richard Davies case:

1. Is the noncompetition agreement between the agency and defendant Davies valid?

2. If the noncompetition agreement is a valid contract, are the restraints imposed by the agreement reasonable?

3. If the noncompetition agreement is enforceable, is plaintiff entitled to monetary damages?

1. Richard Davies neither signed nor was shown the noncompetition agreement before commencing employment. Richard Davies was presented with the covenant four months after he began work, and was told to sign by his father. The implications of the agreement were not discussed. Richard testified that his father assured him that it was a formality. Defendant Davies argues that a noncompetition agreement entered into after an employee has already begun work for an employer, and for which no additional consideration other than continued employment is given, is void. This issue has not yet been addressed by this court. The trial court held that, under the circumstances, there was sufficient consid-eration, including continued employment, for Richard Davies' promise.

Decisions in other jurisdictions on this issue are quite evenly divided. Those cases which have held that continued employment is not a sufficient consideration stress the fact that an employee frequently has no bargaining power once he is employed and can easily be coerced. By signing a non-competition agreement, the employee gets no more from his employer than he already has, and in such cases there is a danger that an employer does not need protection for his investment in the employee but instead seeks to impose barriers to prevent an employee from securing a better job elsewhere. *See, e. g., James C. Greene Co. v. Kelley,* 261 N.C. 166, 134 S.E.2d 166 (1964); *Worth Chemical Corp. v. Freeman,* 261 N.C. 780, 136 S.E.2d 118 (1964); *George W. Kistler, Inc., v. O'Brien,* 464 Pa. 475, 347 A.2d 311 (1975); *Morgan Lumber Sales Co. v. Toth,* 41 Ohio Misc. 17, 321 N.E.2d 907 (1974). Decisions in which continued employment has been deemed a sufficient consideration for a noncompetition agreement have focused on a variety of factors, including the possibility that the employee would otherwise have been discharged, the employee was actually employed for a substantial time after executing the contract, or the employee received additional compensation or training or was given confidential information after he signed the agreement. *Daughtry v. Capital Gas Co.,* 285 Ala. 89, 229 So.2d 480 (1969); *Faw, Casson & Co. v. Cranston,* 375 A.2d 463 (Del.Ch.1977); *M. S. Jacobs & Associates v. Duffley,* 452 Pa. 143, 303 A.2d 921 (1973). The Iowa Supreme Court has held more generally that continued employment alone, without other circumstances, is sufficient consideration. *Ehlers v. Iowa Warehouse Co.,* 188 N.W.2d 368 (Iowa 1971); *Farm Bureau Service Co. v. Kohls,* 203 N.W.2d 209 (Iowa 1972).

The adequacy of consideration for a noncompetition contract or clause in an ongoing employment relationship should depend on the facts of each case. Mere continuation of employment as consideration could be used to uphold coercive agree-

ments. Yet, in cases such as these presently before the court, the agreement may be bargained for and provide the employee with real advantages. In the Richard Davies case, Richard derived substantial economic and professional benefits from the agency after signing the contract: He continued his employment for 10 years and advanced to a selling position within the agency which would not have been open to him if he had not signed the contract. He received informal training from Everett Davies, was supported by the agency in his license applications, and had sole responsibility for many of the agency's customers. Richard's brother, John, who refused to sign an agreement, was limited to a largely clerical position during his tenure with the agency. We therefore agree with the trial court that there was adequate consideration to support the noncompetition agreement.

2. In the Richard Davies case, the trial court further held that although the agreement was a validly executed contract, its terms were overbroad and unreasonable. The test of reasonableness of a noncompetition contract was well stated in *Bennett v. Storz Broadcasting Co.*, 270 Minn. 525, 534, 535–36, 134 N.W.2d 892, 899–900 (1965):

> The test applied is whether or not the restraint is necessary for the protection of the business or good will of the employer, and if so, whether the stipulation has imposed upon the employee any greater restraint than is reasonably necessary to protect the employer's business, regard being had to the nature and character of the employment, the time for which the restriction is imposed, and the territorial extent of the locality to which the prohibition extends.

> \* \* \* \* \* \*

> The validity of the contract in each case must be determined on its own facts and a reasonable balance must be maintained

between the interests of the employer and the employee.

The trial court found that the agency had a protectable interest in its client relationships but that the scope of the agreement was overly broad. The agency did little bond work outside Hennepin County; therefore, a prohibition against employment in the insurance business within 50 miles of Minneapolis, St. Paul or Duluth was unreasonable. On the duration question, the trial curt evaluated the five–year period under two alternative standards: the length of time necessary to obliterate the identification between employer and employee in the minds of the employer's customers (adopted by the Wisconsin Supreme Court in *Lakeside Oil Co. v. Slutsky*, 8 Wis.2d 157, 98 N.W.2d 415 (1959)) and the length of time necessary for an employee's replacement to obtain licenses and learn the fundamentals of the business. The trial court concluded that one year would be a proper length of time in this case under either standard, and modified the agreement to prohibit Richard Davies from engaging in the sale of bonds within Hennepin County for one year from the date of his last active employment.[1]

It appears that the agency's actual need for protection is limited to prohibiting its former employees from actively soliciting business from agency customers. A broader restriction than this could not enhance the agency's business: If a former employee were prohibited from selling any insurance in the area, the customers not served by him would not necessarily choose the Davies agency from all other insurance agencies. Instead, a blanket prohibition would only hurt the former employee's livelihood. Such restrictions have been expressly disapproved by this court. *Bennett v. Storz Broadcasting Co.*, 270 Minn. 525, 134 N.W.2d 892; *Combined Insurance Co.*

---

1. Minnesota adopted the "blue pencil doctrine," which allows a court to modify an unreasonable noncompetition agreement and enforce it only to the extent that it is reasonable, in the context of a sale of a business, in *Bess v. Bothman*, 257 N.W.2d 791 (Minn.1977). The reasons for permitting modification in that con-

text are equally applicable to the employment context. Therefore, in employment cases, a court should be permitted to make changes such as those made by the trial court in this case rather than be compelled to strike down the entire agreement as unreasonable.

*of America v. Bode,* 247 Minn. 458, 77 N.W.2d 533 (1956); *Standard Oil Co. v. Bertelson,* 186 Minn. 483, 243 N.W. 701 (1932). Everett Davies himself implied that this would be the general effect of enforcing the terms of the noncompetition agreement. He gave as a reason for not enforcing it, "We had an agency policy that recognized that people in the insurance industry had the right and the necessity to make a living * * *" and "* * * I recognize the fact that they have to have a right to make a living. The insurance industry is what they are involved in, where their experience is, they can go and work for an insurance company or another agency if they just leave us alone."

■ Thus, based upon this practice of the agency, a prohibition against active solicitation of agency clients by a former employee is all that is reasonably necessary to protect the agency's interest in the insurance area. The two alternative standards used here by the trial court to determine appropriate duration for the agreement would appear to provide effective protection for an employer's interests without imposing unnecessary hardship on an employee's livelihood. Therefore, we hold that this modification, along with the trial court's "blue pencil" revisions made under the reasonableness test, are applicable in the Richard Davies case.

■ 3. The agency claims that it is entitled to damages in the Richard Davies case because Richard breached the one-year noncompetition restriction imposed by the trial court. However, the trial court found that Richard did not solicit bonds for anyone following the termination of his employment with the agency. There is sufficient support for this conclusion in the record, and therefore plaintiff is not entitled to damages.

■ The agency also argues that it is entitled to exemplary damages and expenses under Minn.R.Civ.P. 37.03 in the Davies case because Richard Davies refused to truthfully respond to plaintiff's request for admissions relating to acts by the defendant to solicit and divert business. Plaintiff claims that defendant's categorical denial of such acts forced the plaintiff to unnecessarily incur substantial expense in developing proof on this issue. We agree with the trial court that there is simply no evidence in the record to show that the refusal to make admissions was unreasonable or in bad faith, and plaintiff did not in fact prove that Richard acted to solicit business, as required under Rule 37.03.

Robert Buckingham, the defendant in the second case, was contacted by an employment agency in January 1977 about possible employment with plaintiff agency. Buckingham was successfully employed elsewhere and was not interested in being a mere employee of the Davies agency. By this time, Everett Davies was convinced that his plan to have Richard succeed him in the agency was unattainable, and after a series of negotiations he offered to initially sell Buckingham one percent of the agency stock, with the opportunity to ultimately acquire 51 percent of the stock. On January 28, 1977, Buckingham and Everett Davies executed a letter of intent which detailed their plans for the initial transfer of stock within six months and provided Buckingham with the option of acquiring a controlling interest in the agency. The letter did not address matters relating to Buckingham's employment other than the stock acquisition. It specifically provided that a final agreement must be prepared and agreed upon before any binding obligations would be incurred by either party. Buckingham testified that he would not have left his previous employment and joined the Davies agency without receiving the option to acquire a controlling interest, or without a signed letter of intent.

Buckingham knew at the time he agreed to join the agency that the agency would require him to sign a stringent noncompetition agreement. However, he testified that he was not shown a copy of the agreement or informed of its terms before he began working for the agency. Everett Davies did explain to him that the agency had an unwritten policy of not enforcing the terms of the agreement against a former employ-

ee, even though the employee continued in the insurance business, as long as he did not divert customers of the agency.

Buckingham began working for the agency on February 14, 1977. On February 25, Buckingham was shown and asked to sign the noncompetition agreement. Buckingham did sign it, but he testified that he did so reluctantly and told Everett that his consent was predicated on their earlier employment contract (the letter of intent).

Neither the initial sale of one percent of the stock nor the sale of a controlling interest was ever completed. The "final agreement" necessary to bind the parties was never developed. Buckingham testified that he approached Everett repeatedly on the subject of the initial sale of stock but that Everett had always replied that his accountant had not completed the necessary valuation of the stock.

Because no progress was made toward the sale of agency stock, and because of the employee and related problems within the agency, Buckingham terminated his employment as of June 30, 1978. He began working for another insurance agency, defendant Ed Arnold Company, on July 1. Several customers whom Buckingham had serviced at Davies & Davies contacted him to handle their insurance business after he left the Davies agency, and he accepted their business. No evidence that Buckingham actively solicited business from clients of the Davies agency was introduced; however, the Arnold agency did distribute an announcement that Buckingham had joined it. The Davies agency and Everett Davies commenced this suit on June 21, after they received notice of Buckingham's resignation but before he left the agency.

The issues in the Buckingham case are the same as those in the Davies case. The trial court found, and the evidence is clear, that while Buckingham had been made aware of the existence of the Restrictive Covenant during employment negotiations, he was not given an opportunity to examine or inspect the document, although he requested it, nor advised that he was required to sign or lose his job until 11 days after he commenced employment with the Davies agency and 28 days after he terminated his employment with his former employer. The trial court concluded that the Employment Contract and Restrictive Covenant, dated February 25, 1977, was without consideration and unenforceable.

We agree with the trial court that the Restrictive Covenant was invalid and unenforceable and that the Davies agency has no entitlement to damages from Buckingham.

For the reasons stated above, in the Richard Davies case, the noncompetition agreement is revised as indicated; the trial court's findings are modified; and the denial of damages is affirmed. The Buckingham case is affirmed.

Affirmed.

PETERSON, J., took no part in the consideration or decision of this case.

TODD, J., took no part in the consideration or decision of this case.

AMDAHL, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

SIMONETT, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.