ECOLAB, INC., a Delaware corporation, Respondent,

v.

**Thomas M. GARTLAND, Appellant.**

No. C4–95–961.

Court of Appeals of Minnesota.

Sept. 19, 1995.

Michael V. Ciresi, Thomas B. Hatch, and
Shelley Carthen Watson, Robins, Kaplan,
Miller & Ciresi, Minneapolis, for respondent.

Jeffrey J. Keyes, James J. Long, and Jay W. Schlosser, Briggs & Morgan, Minneapolis, for appellant.

Considered and decided by NORTON, P.J., and HUSPENI and KLAPHAKE, JJ.

## OPINION

NORTON, Judge.

Respondent Ecolab, Inc. sought temporary and permanent injunctive relief against appellant Thomas Gartland, a former employee, for breach of a non-compete agreement and misappropriation of confidential and proprietary information. The trial court issued a temporary injunction against Gartland. Gartland appeals from this order, arguing the trial court abused its discretion in issuing the injunction. We reverse and remand.

## FACTS

Appellant Thomas Gartland began working for respondent Ecolab, Inc. (Ecolab) on October 13, 1980, as a territory manager in training. On October 22, 1980, he signed a non-compete agreement. The pertinent provision of the agreement states:

> For a period of one (1) year immediately following the termination of his employment with the Company, the Employee will not service, sell, solicit the sale of, or accept orders for any COMPETING PRODUCTS to any customer of the Company with whom the Employee did business, or whose accounts was supervised by or assigned to the Employee or with regard to which the Employee received commissions or other compensation, at any time during the twelve (12) month period immediately preceding the termination of his employment. During said one year following termination, the Employee also will not assist any COMPETING FIRM to engage in the activities prohibited by the foregoing sentence. A COMPETING FIRM means any person or organization (including one owned in whole or in party by the Employee) which is engaged in the development, production, use, marketing or sale of a COMPETING PRODUCT. A COMPETING PRODUCT means any product or service which is the same as, or

similar to, and competes with, a product or service of the Company which was part of the product or service line handled by the employee, or persons supervised by the Employee, during his last two (2) years of employment by the Company.

The agreement also contains a confidentiality provision, under which Gartland agreed not to disclose confidential information acquired while at Ecolab. Although Ecolab had a policy of requiring upper-level management to sign a more restrictive noncompete agreement when promoted, Ecolab did not require Gartland to sign any other agreement than the one at issue here.

Gartland first worked in Ecolab's institutional division, which manufactures and sells soap and detergent products to various institutions. He advanced to the position of district manager, then assistant vice president of national accounts. On January 1, 1989, Gartland moved laterally to the pest elimination division, which provides extermination products and services to restaurants, hotels, and motels. In January 1991, Gartland was promoted to vice president of national accounts for the pest elimination division, and in 1994 to vice president, corporate accounts, pest elimination for North America. He remained with the pest elimination division until he resigned in November 1994.

The pest elimination and institutional divisions of Ecolab are operated as separate organizations, with separate financial structures, sales and service organizations, and management teams. Ecolab encourages cooperative sales efforts between its divisions, however, through a "circle the customer" concept. The goal of this strategy is to have Ecolab service all of a customer's needs that can be met by Ecolab's different divisions.

Gartland utilized Ecolab's "circle the customer" strategy in building business for the pest elimination division. He participated in joint sales calls and joint proposals made to institutional customers as well as market strategy planning with institutional personnel; he required the employees he supervised to do likewise. In addition, he promoted institutional product sales by providing

introductions for institutional sales personnel with pest elimination customers.

In November 1994, Gartland accepted a position with Diversey Corp., a major competitor of Ecolab's institutional division. When Ecolab learned Gartland had solicited business for Diversey from Ecolab's institutional customers, it notified Gartland and Diversey by letter dated January 11, 1995, that it considered his actions a breach of the non-compete agreement. Diversey, who interpreted the non-compete agreement as preventing Gartland from competing with Ecolab's pest elimination division only, responded by stating that Gartland would not refrain from soliciting Ecolab's institutional customers.

Ecolab filed this action and moved for a temporary injunction. After a hearing, the trial court issued the injunction, restraining Gartland from

> contacting or accepting orders for institutional sales products and services from all former customers constituting [Ecolab's] Institutional Corporate Sales Accounts, whom [Gartland] contacted and had access to, in accordance with employment agreement.

The trial court found that, even though Gartland worked for the pest elimination division, he had "handled" institutional products through his extensive participation in the "circle the customer" concept. It also found Ecolab had proved a threat of irreparable harm through the potential for wrongful disclosure of confidential institutional information to which Gartland had had access through his participation in the "circle the customer" program. Gartland requested, and this court granted, an expedited appeal.

## ISSUE

Did the district court err in its interpretation of the noncompete agreement and abuse its discretion by granting the temporary injunction?

## ANALYSIS

■ "A temporary injunction is an extraordinary equitable remedy that preserves the status quo pending a trial on the merits." *Central Lakes Educ. Ass'n v. Independent Sch. Dist. No. 743*, 411 N.W.2d 875, 878 (Minn.App.1987), *review denied* (Minn. Nov. 13, 1987). A party seeking a temporary injunction must show it has no adequate remedy at law and interim relief is necessary to prevent "great and irreparable injury." *Id.* (quoting *Cherne Indus. v. Grounds & Assocs.*, 278 N.W.2d 81, 92 (Minn.1979)). The decision to grant a temporary injunction is committed to the trial court's discretion and should be reversed only upon a clear abuse of discretion. *Carl Bolander & Sons Co. v. City of Minneapolis*, 502 N.W.2d 203, 209 (Minn.1993). We view the facts in the light most favorable to the party prevailing below. *North Star State Bank v. North Star Bank Minnesota*, 361 N.W.2d 889, 893 (Minn.App. 1985), *review denied* (Minn. Apr. 26, 1985).

■ When reviewing a trial court's decision to issue a temporary injunction, this court considers five factors:

> (1) the relationship of the parties; (2) the relative harm to the parties if the injunction is or is not granted; (3) the likelihood of success on the merits; (4) public policies expressed in statutes; and (5) the administrative burdens in supervising and enforcing the decree.

*Sanborn Mfg. Co. v. Currie*, 500 N.W.2d 161, 163 (Minn.App.1993). The factor of greatest concern here is Ecolab's likelihood of success on the merits.

■ The court dislikes and closely scrutinizes non-compete agreements, because they partially restrict trade. *National Recruiters v. Cashman*, 323 N.W.2d 736, 740 (Minn.1982). In order to be enforceable, non-compete agreements must be reasonable and supported by consideration. *See Davies & Davies Agency v. Davies*, 298 N.W.2d 127, 131 (Minn.1980) (discussing policy reasons for these elements). Gartland argues that the trial court erred when it found that Ecolab would likely prove that the non-compete agreement at issue here is enforceable and would preclude him from competing with Ecolab's institutional division. We agree.

The non-compete agreement defines a competing product as one similar to and competitive with "part of the product or service line handled by the Employee." This case

turns upon whether that phrase applies only to the products sold by the pest elimination division in which Gartland worked for the last two years of his Ecolab employment or whether that phrase can be applied to the product lines of other divisions with which Gartland had significant interaction. Both parties offer reasonable definitions for "handle." Gartland, relying on several insurance law cases, urges us to adopt a narrow definition: "to buy and sell, or to deal or trade in." *See, e.g., Olympic S.S. Co. v. Centennial Ins. Co.,* 117 Wash.2d 37, 811 P.2d 673, 680 (1991) (adopting similar definition). Ecolab, on the other hand, urges a broad definition the trial court extracted from a Missouri tax law case, *State ex rel. Bell v. Phillips Petroleum Co.,* 349 Mo. 360, 160 S.W.2d 764, 769 (1942). Relying on this case, the trial court here found "handle" meant " 'to control, direct, to deal with, to act upon, and to perform some function with regard to, to manage or operate,' in addition to 'sell, buy, deal, or trade in.' "

▬ A contract is ambiguous when its language is reasonably susceptible to more than one interpretation. *Current Technology Concepts v. Irie Enter.,* 530 N.W.2d 539, 543 (Minn.1995). Although it is unclear whether the trial court found the language at issue here ambiguous, we note that the question of whether an ambiguity exists is one of law. *See id.* Because both of the definitions offered by the parties could reasonably be applied to the contract language, we conclude that the language is ambiguous.

▬ When construing an ambiguous contract, the court has a duty to give effect to the intent of the parties. *Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 66 (Minn.1979); *Midway Ctr. Assocs. v. Midway Ctr., Inc.,* 306 Minn. 352, 356, 237 N.W.2d 76, 78 (1975). The court construes any ambiguities in the contract against the drafting party. *Current Technology Concepts,* 530 N.W.2d at 543. As the supreme court has stated:

> [W]here a contract is open to two interpretations, the one more favorable to the party who did not draft the instrument should be adopted in the absence of a clear show-

ing that a contrary meaning was intended by the parties at the time of its execution.

*Wick v. Murphy,* 237 Minn. 447, 453, 54 N.W.2d 805, 809 (1952); *accord Turner,* 276 N.W.2d at 66; *Beattie v. Product Design & Eng'g,* 293 Minn. 139, 149, 198 N.W.2d 139, 144 (1972). A court ascertains the parties' intent by putting itself in the parties' positions at the time they formed the contract and determining what they reasonably meant to accomplish in view of the contract as a whole, its plain language, and the surrounding circumstances. *Midway Ctr. Assocs.,* 306 Minn. at 356, 237 N.W.2d at 78. The court may also rely on extrinsic evidence to resolve an ambiguity. *See Turner,* 276 N.W.2d at 66 (court consulted various possible definitions to decide meaning of terms at issue).

The trial court here held that the broader definition of "handle" was warranted, because:

> The Court is not convinced by defendant's interpretation of the term "handle" in the context of this case. Defendant's attempt to narrowly construe the language of the noncompete provision undermines the meaning of "handle" as it applies to sales industry standards, especially with regards to positions in upper management corporate sales.

We conclude that the trial court erred by applying the broader definition. First, the court was not permitted to base its decision on industry standards, because the record shows that the parties presented no evidence of the standard practices of any corporation, except Ecolab. Furthermore, the evidence pertaining to Ecolab's business practices relates to current practices. The record is not clear about when Ecolab instituted its "circle the customer" program, or whether it anticipated that Gartland would have such significant interaction with other Ecolab divisions. We note that, at the time Gartland signed the agreement, he was a territory manager in training, not the senior sales executive he was at his departure. This evidence is not helpful in ascertaining what the parties' intent was fifteen years ago, in 1980, when Ecolab and Gartland entered into the noncompete agreement.

The intent of the agreement, clearly enough, was to prevent Ecolab's employees from using the training, confidential information, and good will developed while at Ecolab to compete directly with Ecolab. That intent is an insufficient basis upon which to infer that Ecolab, in 1980, intended the non-compete agreement to apply to the present circumstances. "Public policy requires that restrictive covenants be strictly construed and not extended beyond the true intent of the parties." *Naftalin v. John Wood Co.*, 263 Minn. 135, 147, 116 N.W.2d 91, 100 (1962). We note that the language reads "*the* product or service line handled by the Employee," not "any" or "all" lines handled by the employee; this language supports a narrow construction. Furthermore, the record contains a different Ecolab non-compete agreement with more restrictive language, which shows that Ecolab recognized its need to protect its investment in situations like the one at issue here and knew how to accomplish that. Based on the evidence in the record, Gartland was entitled to the benefit of the rule mandating strict construction of the ambiguity. The trial court erred by not construing the agreement narrowly.

The record shows Ecolab's different operating divisions were maintained separately within the corporation, with separate product lines, management structures, and financial operations. While working in the pest elimination division, Gartland did not have the authority to sell or make decisions regarding the products of other Ecolab divisions, including the institutional division. Gartland may have benefitted indirectly through increases in institutional sales through corporate good will or increased pest elimination sales opportunities, but his compensation was dependent upon pest elimination sales. Under the narrow interpretation of the contract, Gartland only "handled" pest elimination products and services; thus, Gartland can be barred only from competing with Ecolab's pest elimination division. Diversey does not compete with this Ecolab division. The trial court therefore erred in finding that Ecolab was likely to prove Gartland breached the non-compete agreement.[1] Of course, Gartland remains bound by his agreement not to disclose confidential information acquired while an Ecolab employee.

Because we conclude that the non-compete agreement does not apply to the activities that Ecolab seeks to enjoin, we do not reach Gartland's other arguments for reversing the trial court's order. We note, however, that our decision is bolstered by our concerns that the trial court did not make the appropriate findings on the relative harms to be suffered by the parties in this case.

■ Although the trial court concluded that Ecolab faced "a clear threat of irreparable harm," its order does not include findings regarding the harms Gartland might suffer if the injunction issued. Gartland has a lower standard to meet to bar the injunction; therefore, findings on this issue were necessary. *See Yager v. Thompson*, 352 N.W.2d 71, 75 (Minn.App.1984) (party seeking to trigger injunction must show irreparable harm, but opposing party must only show substantial harm to bar it). Similarly, the trial court's order suggests that it did not consider the reasonableness of the non-compete agreement, an inquiry which requires a balancing of the equities. *Satellite Indus. v. Keeling*, 396 N.W.2d 635, 640 (Minn.App. 1986), *review denied* (Minn. Jan. 21, 1987). Consequently, this case is not the exceptional one in which the injunction may issue in spite of Ecolab's weak showing of likelihood of success on the merits. *See Sanborn Mfg. Co.*, 500 N.W.2d at 164–65 (if plaintiffs make strong showing of irreparable harm, but weak showing of likely success on the merits, injunction may still issue).

■ Gartland also argues that the trial court erred by failing to condition the temporary injunction upon the filing of some form of security and by failing to address whether a bond was required in its order. Because we hold in Gartland's favor, we do not reach this issue. We note, however, that Minn.R.Civ.P. 65.03 provides that a temporary injunction shall not be granted unless

---

**1.** Our decision does not, however, preclude Ecolab from prevailing in the trial for permanent injunctive relief if it can show evidence of the parties' intent, in 1980, to permit a broader construction of the agreement than the facts here allow.

security is provided to guarantee payment of costs or damages incurred by the wrongful issuance of an injunction. In the exercise of its discretion, a trial court may waive the security requirement. *Howe v. Howe,* 384 N.W.2d 541, 546 (Minn.App.1986). To facilitate appellate review, however, a trial court should note its decision to do so. *See Bio–Line, Inc. v. Burman,* 404 N.W.2d 318, 322 (Minn.App.1987) (trial court abused its discretion either by failing to address security requirement or by waiving the requirement without stating its reasons for doing so).

We deny Gartland's motion to strike portions of Ecolab's appendix. The record on appeal consists of the "[t]he papers filed in the trial court, the exhibits, and the transcript of the proceedings, if any." Minn. R.Civ.App.P. 110.01. The items about which Gartland complains are in the district court file, a fact Gartland does not contest.

## DECISION

The trial court erred in construing the non-compete agreement broadly and abused its discretion by determining that Ecolab was entitled to temporary injunctive relief. We reverse the order granting the temporary injunction, and remand the case for trial on the merits.

**Reversed and remanded.**