**SOFTCHOICE, Inc., Appellant (A08–0763), Respondent (A08–0965),**

v.

**Martin SCHMIDT, et al., Respondents (A08–0763),**

**Martin Schmidt, Defendant (A08–0965),**

**Michael Johnson, Appellant (A08–0965).**

Nos. A08–0763, A08–0965.

Court of Appeals of Minnesota.

April 7, 2009.

---

Joseph G. Schmitt, Teresa J. Kimker, Katie Connolly, Halleland Lewis Nilan & Johnson, PA, Minneapolis, for appellant/respondent Softchoice, Inc.

John B. Gordon, Daniel G. Wilczek, Bruce Jones, Joel P. Schroeder, W.T. Roberts, III, Faegre & Benson, LLP, Minneapolis, for respondents/defendant/appellant Martin Schmidt, et al. and Michael Johnson.

Considered and decided by HUDSON, Presiding Judge; CONNOLLY, Judge; and PORITSKY, Judge.*

**O P I N I O N**

CONNOLLY, Judge.

Alleging violations of a non-competition and a non-solicitation agreement, Soft-

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

choice, Inc. (Softchoice) sought temporary injunctions against two former employees, Martin Schmidt and Michael Johnson. The district court granted a temporary injunction against Johnson but not Schmidt. In these consolidated appeals, Softchoice (A08–0763) challenges the district court's refusal to issue a temporary injunction against Schmidt, and Johnson (A08–0965) challenges the district court's decision to issue a temporary injunction against him. Because the district court did not abuse its discretion, we affirm.

## FACTS

*Softchoice & Schmidt (A08–0763):*

Schmidt worked for Softchoice from 1999 to 2001. After leaving Softchoice, Schmidt began working for Software Plus, Ltd. (Software). Schmidt worked approximately six years for Software as a business-development manager until it was acquired by Softchoice. Softchoice and Software were essentially in the same business, acting as intermediaries between software vendors and end-use corporate consumers.

Prior to Softchoice's acquisition of Software, Schmidt was offered the opportunity to participate in an employee-retention plan. The retention plan provided that Schmidt would potentially receive monetary retention credits by Software that would be paid out if certain events occurred. At the same time he was offered the opportunity to participate in the retention plan, Schmidt was told that it was necessary to sign a stand-alone non-competition agreement if he wished to participate in the retention plan. Schmidt signed both agreements on November 28, 2006.[1]

Section 2 of the retention plan, under the heading "Award of Retention Credits," provides:

> Simultaneously with the establishment of the [retention plan] and each fiscal year of [Software], the Board *may award credits* ("Retention Credits") to Participants. The Retention Credits for each fiscal year of Company shall be allocated to Participants in amounts as determined *solely in the Board's discretion.* Such Retention Credits shall be paid into a Participant's Retention Trust within thirty (30) days after the award, which is anticipated to be at the time of Participant's annual review.

(Emphasis added.)

The retention plan also contained a non-competition clause. If a plan participant violated this clause, then they would "not be entitled to receive any Employment Retention Benefit." In December 2006, Software deposited $25,000 into Schmidt's account.

In addition to the non-competition clause contained within the retention plan, Schmidt signed a stand-alone non-competition agreement as a condition of participating in the retention plan. This non-competition agreement provided that, for a period of one year following the termination of Schmidt's employment, he could not compete within the State of Minnesota without the consent of Software. The stand-alone agreement stated that Schmidt's consideration for entering into the agreement was his "inclusion in the Software Plus Employee Retention Plan."

In essence, if Schmidt violated the non-competition agreement contained within the retention plan, he would lose any benefit he was entitled to under the plan. It

---

1. To be clear, Schmidt signed three agreements: (1) the employee-retention plan, which contained non-competition, non-solicitation, and confidentiality clauses; (2) the stand-alone confidentiality and non-competition agreement; and (3) a trust agreement that is not relevant to the resolution of this appeal.

did not purport to prevent Schmidt from competing against Software; rather, it imposed a penalty, the forfeiture of any accrued retention credits, for competing against Software. In contrast, the stand-alone non-competition agreement did purport, in exchange for Schmidt's participation in the retention plan, to prevent Schmidt from engaging in competitive practices against Software.

Softchoice acquired Software on December 11, 2007.[2] Following the acquisition, Schmidt spoke with Softchoice's director of enterprise sales, Chris Illingworth, regarding the agreements he had entered into with Softchoice. Illingworth informed Schmidt that Softchoice was willing to pay out the money in his employee-retention account in exchange for Schmidt's agreement to sign a "waiver and release." The waiver and release provided that Schmidt would receive the money if he would "acknowledge" that the non-competition agreement contained within the employee retention plan would "remain" in effect. Schmidt later e-mailed Illingworth to see if he was correct in his understanding that if he didn't sign the waiver and release, then he wouldn't be subject to the non-compete agreement contained within the plan. Illingworth did not respond to Schmidt, and Schmidt never signed the waiver and release. The retention plan and the stand-alone agreement are governed by Missouri law pursuant to a choice-of-law clause contained in both documents.

Schmidt tendered his resignation on December 21, 2007. On January 3, 2008, he began working for En Pointe Technologies, Inc. (En Pointe). Based on our review of the record before us, it is beyond dispute that Schmidt's new position with En Pointe violated the stand-alone non-competition agreement as well as the non-competition agreement contained within

the retention plan. It is also undisputed that Schmidt has forfeited any right to the retention credits he may have had as a result of his violation of the non-competition agreement contained within the retention plan. What is in dispute is whether the stand-alone non-competition agreement is legally binding. The answer to this question, in turn, depends on whether the stand-alone agreement was supported by adequate consideration. The district court concluded it was not, saying:

> The employee benefit plan is not sufficient consideration for the [stand-alone non-compete] agreement. Both parties agree that Schmidt never received any money from the employee retention plan, nor will he. *National Motor Club of Mo. v. Noe,* 475 S.W.2d 16 (Mo.1972).

*Softchoice & Johnson (A08–0965):*

Softchoice hired Johnson as a sales representative on March 12, 2001. At the end of December 2006, a branch manager position for Softchoice's Minneapolis office became available. Johnson was interviewed for the position on January 7, 2007 by a panel of Softchoice employees that included Douglas Stabenow, Softchoice's director of sales for the central region and Johnson's supervisor. Later that day, Stabenow informed him in an e-mail that he had received the promotion. At this time, Johnson was informed by Stabenow that he should expect a "formal offer out of HR" and that it would "finalize everything." The following day Stabenow sent an e-mail to all Softchoice employees in the United States and Canada that informed them of Johnson's promotion. While Johnson may have had a general idea regarding the responsibilities his new position entailed from the interview process and his experience as an employee, Johnson had not yet received any information

---

**2.** For ease of reference, we will now refer to agreements that Schmidt entered into with Software as agreements entered into with Softchoice.

regarding the terms and conditions of his new position.

On January 16, 2007, Softchoice's human resources department sent a formal offer letter of promotion to Johnson, detailing the benefits and responsibilities of a branch manager. Under the heading "Terms and Conditions," the offer letter listed Johnson's salary, long-term incentive package, car-and cell-phone allowance, benefits, expense plan, and who Johnson would report to. Although the letter was dated January 16, 2007, it stated that the promotion's effective date was January 2, 2007, which was before Johnson interviewed for the position.[3]

The offer letter also contained a non-solicitation agreement. Regarding the non-solicitation agreement, the letter stated: "[I]n accepting this role the Company expects a higher level of demonstrated responsibility from you with respect to confidentiality of information *along with your agreement that you will not solicit employees or customers as detailed below if you choose to leave Softchoice.*" (Emphasis added.) The duration of the agreement was for one year after Johnson left Softchoice. Following the non-solicitation agreement, the offer letter provided:

> Please carefully review and consider the terms of this letter and, if you so desire, obtain independent advice with respect to it. Please sign the enclosed copy and return it within three (3) business days so as to signify your acceptance of the terms of your employment with the Company. *If we do not receive a signed offer within the stated time frame this offer becomes null and void.*

(Emphasis added.)

Johnson signed and returned the offer letter to Softchoice on January 17, 2007.[4]

On December 27, 2007, Johnson informed his supervisor that he was resigning from Softchoice. In January 2008, Johnson began working for En Pointe. Based on our review of the record, it is not disputed that Johnson violated the terms of the non-solicitation agreement contained in his offer letter. What the parties do dispute, however, is whether the agreement was supported by adequate consideration. Specifically, Johnson argues that his promotion cannot act as consideration for the non-solicitation agreement because his promotion was effective prior to receiving the offer letter that contained the non-solicitation agreement.

In its findings of fact regarding Johnson, the district court stated that "his promotion was contingent on signing the agreement containing the nonsolicitation provision." The district court then granted Softchoice's request for a temporary injunction as to Johnson.

## ISSUES

*Softchoice & Schmidt (A08–0763):*

1. Did the district court abuse its discretion when it denied Softchoice's motion for a temporary injunction against Schmidt?

*Softchoice & Johnson (A08–0965):*

2. Did the district court abuse its discretion when it granted Softchoice's motion for a temporary injunction against Johnson?

## ANALYSIS

"A decision on whether to grant a temporary injunction is left to the discre-

---

**3.** After signing the offer letter, Johnson received a retroactive pay increase that went into effect on January 1, 2007.

**4.** This is the only non-solicitation or non-compete agreement that Johnson entered into with Softchoice.

tion of the trial court and will not be overturned on review absent a clear abuse of that discretion." *Carl Bolander & Sons Co. v. City of Minneapolis,* 502 N.W.2d 203, 209 (Minn.1993). "A district court's findings regarding entitlement to injunctive relief will not be set aside unless clearly erroneous." *Haley v. Forcelle,* 669 N.W.2d 48, 55 (Minn.App.2003), *review denied* (Minn. Nov. 23, 2003).

■ There are five factors that must be weighed when determining whether to issue a temporary injunction: 1) the nature of the relationship between the parties preexisting the dispute giving rise to the request for relief, 2) the harm to be suffered by one party if the temporary injunction is denied compared with the harm inflicted on the other party if relief is granted, 3) the likelihood that one party or the other will prevail on the merits, 4) public policy, and 5) the administrative burdens in supervising and enforcing the injunction. *Dahlberg Bros., Inc. v. Ford Motor Co.,* 272 Minn. 264, 274–75, 137 N.W.2d 314, 321–22 (1965). Of these factors, the most important is a party's likelihood of prevailing on the merits at trial. *Id.* at 275, 137 N.W.2d at 322.

1. **The district court did not abuse its discretion when it denied Softchoice's motion for a temporary injunction against Schmidt.**

■ The retention plan and stand-alone agreements between Softchoice and Schmidt specify that Missouri law governs disputes arising from the two contracts. *See Medtronic, Inc. v. Advanced Bionics Corp.,* 630 N.W.2d 438, 449, 454 (Minn. App.2001) (stating that Minnesota courts give effect to the parties' choice of law in a contract). As a result, we resolve this dispute by applying substantive Missouri

law to the *Dahlberg* five-factor test for injunctive relief in order to determine if the district court clearly abused its discretion when denying Softchoice a temporary injunction.[5]

■ Missouri law, like Minnesota law, disfavors non-compete agreements because they restrain trade and an employee's right to earn a living. *See Sturgis Equipment Co. v. Falcon Indus. Sales Co.,* 930 S.W.2d 14, 16–17 (Mo.Ct.App.1996). As a result, non-compete agreements are strictly construed. *Healthcare Servs. of the Ozarks, Inc. v. Copeland,* 198 S.W.3d 604, 613 (Mo.2006); *Orchard Container Corp. v. Orchard,* 601 S.W.2d 299, 303 (Mo.Ct. App.1980) ("Because non-compete agreements are considered to be in restraint of trade, they are presumptively void and enforceable only to the extent that they are demonstrably reasonable.").

The district court concluded that "[t]he employee benefit plan is not sufficient consideration for" the stand-alone non-compete agreement. Based on our review of Missouri law, we agree. The plain language of the retention plan makes it clear that, at the time the stand-alone agreement was entered into, Softchoice was under no obligation to place any retention credits into Schmidt's account. The plan states that Softchoice's board "may award credits" and that the retention credits for any given year would be allocated "solely in the Board's discretion." The plan does not state that Softchoice's board must award credits to Schmidt.

■ Under Missouri law, " 'contracts which depend for performance upon the wish, the will, or the pleasure of one of the parties are unilateral and cannot be enforced.' " *Jump v. Manchester Data Sciences Corp.,* 424 F.Supp. 442, 445 (E.D.Mo. 1976) (quoting *Fullington v. Ozark Poul-*

5. This is the approach taken by the parties and the district court.

*try Supply Co.,* 327 Mo. 1167, 39 S.W.2d 780, 782 (1931)). Here, the decision to place retention credits into Schmidt's account at the time Schmidt entered into the employee-retention plan rested solely with Softchoice. Under the explicit terms of the employee-retention plan, Softchoice did not have to contribute anything into Schmidt's account. Despite this, Softchoice contends that Schmidt's participation in the employee-retention plan constitutes consideration for the stand-alone non-compete agreement. Under our reading of the laws of Missouri, this is not the case. The performance of this contract, namely Softchoice's contribution to Schmidt's account, rested solely with Softchoice. Nothing Schmidt could have done would have obligated Softchoice to award credits to his account. Thus, Schmidt's participation in the plan cannot serve as consideration for the non-compete agreement. In order for an employee-retention plan to serve as consideration for a non-compete agreement under Missouri law, we hold that an employer must be obligated to contribute something of value into the plan at the time its employee enters the plan.[6]

Under Missouri law, it is unlikely that Softchoice would prevail on the merits since the stand-alone non-compete agreement signed by Schmidt was not supported by consideration. Because of this, we conclude that the district court did not clearly abuse its discretion by denying Softchoice's request for injunctive relief.

**2. The district court did not abuse its discretion when it granted Softchoice's motion for a temporary injunction against Johnson.**

Because non-compete agreements restrict trade, they are disfavored and closely scrutinized. *Ecolab, Inc. v. Gartland,* 537 N.W.2d 291, 294 (Minn.App. 1995). "In order to be enforceable, [non-compete] agreements must be reasonable and supported by consideration." *Id.* The test of reasonableness is

> whether or not the restraint is necessary for the protection of the business or good will of the employer, and if so, whether the stipulation has imposed upon the employee any greater restraint than is reasonably necessary to protect the employer's business, regard being had to the nature and character of the employment, the time for which the restriction is imposed, and the territorial extent of the locality to which the prohibition extends.

*Bennett v. Storz Broadcasting Co.,* 270 Minn. 525, 534, 134 N.W.2d 892, 899 (1965).

Here, Johnson argues that the district court clearly abused its discretion when it granted Softchoice's request for a temporary injunction. In addressing the first *Dahlberg* factor, the district court

**6.** We acknowledge, as Softchoice points out, that $25,000 was deposited into Schmidt's account in December 2006 several days after Schmidt signed the agreement. However, under Missouri law it appears that the proper analysis is to look at the parties' obligations at the time a contract is entered into. *Jump,* 424 F.Supp. at 445. Here, Softchoice was not under any obligation to place any money into the retention plan at the time the plan was *signed.* We emphasize that our decision may have been different had we conducted our analysis under Minnesota law. We also

emphasize that this opinion does not stand for the proposition that employee retention plans cannot serve as valid consideration for non-competition or non-solicitation agreements. We think the most thoughtful and complete discussion of this question is found in the analysis set forth by the Connecticut Superior Court in *Aetna Retirement Serv., Inc. v. Hug,* No. CV970479974S, 1997 WL 396212 (Conn.Super.Ct. June 18, 1997). However, we deal with a Missouri and not Connecticut choice-of-law provision.

found that the nature and background of the relationship between the parties prior to the dispute weighed against Johnson. We agree that it was Johnson who disturbed the parties' longstanding relationship by accepting a position with En Pointe. *See County of Winona v. City of Winona*, 453 N.W.2d 710, 711 (Minn.App. 1990) (holding that city's "belated change in position" from the city's prior position supporting the county's plan supported granting an injunction).

In addressing the second *Dahlberg* factor, the district court did not determine whether the balancing of harms favored Softchoice or Johnson. We conclude that either Softchoice or Johnson would suffer harm as a result of the district court's decision to grant or deny Softchoice's request for an injunction. Softchoice would face harm if the injunction was denied because Johnson would be in the position to solicit current Softchoice clients. Johnson would face harm if the injunction was granted because he would be prevented from working with, and receiving wages from, En Pointe.

In addressing the third *Dahlberg* factor, the district court determined that Softchoice was more likely than Johnson to prevail on the merits at trial. We agree. As the district court noted, Johnson's "promotion was contingent on signing the [offer letter] containing the nonsolicitation provision." This statement must be based on the implicit determination that Johnson's promotion served as consideration for the non-solicitation agreement found in the offer letter.[7] There is no dispute that Johnson was promoted or that Johnson signed the letter. There is a dispute surrounding the timing of Johnson's promotion. Specifically, Johnson argues that he was promoted when he was first informed that he would receive the promotion while Softchoice argues that Johnson was promoted when he signed the formal offer letter. This is a key distinction because if Johnson had been promoted prior to signing the offer letter, then the promotion could not serve as consideration for the non-solicitation agreement contained in the offer letter. *See Sheehy v. Bodin*, 349 N.W.2d 353, 354 (Minn.App. 1984) (stating that past consideration cannot support a future promise).

 In order to resolve this dispute, we must determine whether a promotion serves as consideration for a non-solicitation agreement at the time when an employee is informally told that he has been selected for promotion, or at the time when that employee is formally offered the position and signs and accepts an offer letter. This is an issue of first impression before this court. We hold that a promotion serves as consideration for a non-compete agreement at the time when the terms of the promotion have been defined and the promotion has been formally offered and accepted in writing.

While the delineation between when an employee is informed that he will be promoted and when he is actually promoted may not always be clear, the key inquiry is when the promotion provides the employee with "real advantages." *See Davies & Davies Agency, Inc. v. Davies*, 298 N.W.2d 127, 130–31 (Minn.1980) (upholding a non-competition agreement because the employee who signed the agreement "derived

---

**7.** Although the district court did not make this finding explicitly, we note that this does not warrant a remand in the present case because the facts are not seriously in dispute. *See Crowley Co. Inc. v. Metro. Airports Comm'n*, 394 N.W.2d 542, 545 (Minn.App.1986) ("[W]here the record is reasonably clear and the facts not seriously disputed, the judgment of the trial court can be upheld in the absence of trial court findings made pursuant to Rule 52.01.") (quoting *Roberson v. Roberson*, 296 Minn. 476, 478, 206 N.W.2d 347, 348 (1973)).

substantial economic and professional benefits ... *after* signing the [agreement]") (emphasis added); *Overholt Crop Ins. Serv. Co., Inc. v. Bredeson*, 437 N.W.2d 698, 703 (Minn.App.1989) ("Economic and professional benefits are sufficient consideration to support subsequent noncompetition agreements."). Here, Johnson did not receive any "real advantages" from Softchoice when he was informed on the date of his interview that he would be promoted. At this time, he did not receive an increase in compensation, duties, or benefits. *See Nat'l Recruiters, Inc. v. Cashman*, 323 N.W.2d 736, 740–41 (Minn.1982) (stating that because employee and employer were already parties to an employment agreement that defined the employee's compensation, duties, benefits and other terms of employment, additional consideration would be required to support a non-competition agreement). It was only after he signed the offer letter containing the terms of his new position and the non-solicitation agreement that he received any "real advantages" from Softchoice. This is made clear by the offer letter itself, which states that if it was not signed and returned to Softchoice, then the offer of promotion would be "null and void."

Regarding the fourth *Dahlberg* factor, the district court found that public policy weighed against granting the temporary injunction. We agree. It is well-settled that non-solicitation agreements are disfavored because they act to restrain trade. *Ecolab*, 537 N.W.2d at 294.

Regarding the fifth *Dahlberg* factor, the district court found that the administrative burden involved in supervising the temporary injunction would be minimal. The record reflects that Softchoice offered to supervise any injunctive relief that the district court deemed necessary to grant. The district court determined that this of-

fer by Softchoice would alleviate the administrative burdens placed on it. There is nothing in the record that establishes that this determination was an abuse of discretion.

In conclusion, the district court did not clearly abuse its discretion by granting Softchoice's request for injunctive relief. While some of the factors may have weighed against granting the injunction, the key factor, Softchoice's likelihood of success on the merits at trial, weighed in favor of granting the injunction. The reason this factor weighs in Softchoice's favor is because the non-solicitation agreement contained in the offer letter was supported by consideration-specifically, Johnson's promotion, which was effective when he signed his formal offer letter. While Johnson may have been informed that he had been selected for promotion prior to signing the offer letter, he was not actually promoted until he signed the formal offer of promotion which contained, among other things, the terms of promotion, Softchoice's expectations of Johnson, and the non-solicitation agreement.

 Having determined that Johnson signed a valid non-solicitation agreement, we now address the extent of the district court's relief. The district court ordered that, until January 23, 2009,[8] Johnson was restrained from:

> [(1)] directly or indirectly soliciting, enticing or inducing any client or vendor referral source who [Johnson] solicited or did business with on behalf of Softchoice, or with whom [Johnson] otherwise became acquainted as a result of his employment with Softchoice, to become a client, of any other person, firm or corporation with respect to products and/or services then sold or under devel-

---

8. This is one year from the date of the district court's initial temporary restraining order.

opment by Softchoice or competitive with the products and/or services then sold or under development by Softchoice; [(2)] from directly or indirectly soliciting, enticing, or inducing any client or vendor referral source who [Johnson] solicited or did business with on behalf of Softchoice, or whom [Johnson] otherwise became acquainted with as a result of his employment with Softchoice to cease doing business with Softchoice; and [(3) Johnson] is restrained from contacting or approaching any such person, firm, or corporation for such purpose or authorizing or knowingly approving the taking of such actions by any other person.

▆▆▆▆ "Employers have a legitimate interest in protecting themselves against the deflection of trade or customers by the employee by means of the opportunity which the employment has given him." *Webb Publ'g Co. v. Fosshage*, 426 N.W.2d 445, 450 (Minn.App.1988) (quotation omitted). "The reasonableness of a temporal restriction depends on the nature of the job, the amount of time necessary to find and train a replacement for the employee, and the amount of time necessary for the employee's customers to become accustomed to the employee's replacement." *Klick v. Crosstown State Bank of Ham Lake, Inc.*, 372 N.W.2d 85, 88 (Minn.App. 1985).

Here, the district court did not abuse its discretion in its decision as to the extent of the relief ordered. The district court's order is not overbroad as to subject matter. Softchoice has a legitimate business interest in protecting ongoing customer relationships that it has spent years developing and nurturing. The district court's order protects this interest. Turning to the duration of the district court's relief, the record reflects that it takes over a year for a Softchoice employee in Johnson's po-

sition to fully develop customer relationships. Given the amount of time it takes to develop a customer relationship, we also hold that the one-year duration of the non-solicitation period ordered by the district court was not unreasonable.

## D E C I S I O N

*Softchoice & Schmidt (A08–0763):*

Because, at the time Schmidt entered into Softchoice's employee-retention plan, Softchoice had no obligation to place something of value into the plan, Schmidt's participation in the employee-retention plan does not serve as adequate consideration for his non-competition agreement under Missouri law.

*Softchoice & Johnson (A08–0965):*

Because Johnson received "real advantages" from Softchoice only after he accepted in writing Softchoice's formal offer of promotion, which contained the terms of his new position and the non-solicitation agreement, the agreement was supported by consideration.

**Affirmed.**