Melvin ROTH, Plaintiff,

v.

**GAMBLE–SKOGMO, INC., and Red Owl Stores, Inc., a corporation, Defendants.**

Civ. No. 4–81–628.

United States District Court,
D. Minnesota,
Fourth Division.

March 4, 1982.

E. John Abdo, Abdo & Abdo, P. A., Minneapolis, Minn., for plaintiff.

James M. Samples and James D. O'Connor, Faegre & Benson, Minneapolis, Minn., for defendants.

MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on cross motions for summary judgment. The parties, through their respective counsel, have stipulated to a statement of the facts deemed relevant and material to their respective motions for summary judgment. The following eleven paragraphs are the

stipulation of facts reached between the parties.

FACTS

The plaintiff, Melvin Roth, is 61 years of age. He has been in the grocery business at the retail level and as an executive continuously for 31 years. He first started a food market in St. Paul in 1950. In 1960, plaintiff founded Shopper's City food stores, which grew to a retail food chain of nine stores before he sold them to the Zayre Corporation. Plaintiff left Shopper's City in 1974. During all of this time he was the head and chief executive officer of Shopper's City.

Sometime after his resignation from Shopper's City, on September 30, 1974, plaintiff entered the employ of Red Owl Stores, Inc., as its chief executive officer pursuant to a written employment agreement. At that time, Red Owl was, and still is, a wholly owned subsidiary of Gamble-Skogmo, Inc. The employment agreement with plaintiff was executed by Gamble-Skogmo, Inc. The employment agreement was amended on one occasion. The employment agreement, as amended, provided for initial compensation of $75,000 per year and also provided for the payment of deferred compensation.

As chief executive officer of Red Owl, plaintiff was directly responsible for managing all its operations. Snyder's Drug Stores, a subsidiary of Red Owl, was directly managed by its own officers, headed by an executive vice-president who reported to plaintiff. Plaintiff reported to the president and chief executive officer of Gamble-Skogmo. As head of Red Owl, plaintiff had responsibility for making decisions or recommending decisions in the areas of executive hiring, the opening and closing of retail outlets, labor relations, sales, financing, long-range and short-range planning and other such areas. Plaintiff was a member of the Board of Directors of Gamble-Skogmo. He was also a member of (but not the chairman of) the following Red Owl executive committees, which considered and recommended decisions in connection with matters coming under the jurisdiction of those committees:

1. management committee;
2. real estate committee;
3. long-range planning committee;
4. advertising committee.

Final decisions with respect to many of the subjects discussed above and with respect to most of the recommendations of the committees of which he was a member were made by the president and chief executive officer of Gamble-Skogmo and by the top management of Wickes, after Wickes acquired Gamble-Skogmo in August, 1980. As the head of Red Owl, plaintiff's recommendations, whether or not based on committee action, were given significant consideration but were not always necessarily adopted. Plaintiff ran a "tight ship" and was a good manager.

Through his service as chief executive officer of Red Owl and his position on several of Red Owl's committees, plaintiff had access to information not readily ascertainable by Red Owl's competitors. This information related to Red Owl's management decisions concerning pricing, expansion, long-range planning and the like. It was gained at Red Owl's expense and was intended by Red Owl to be kept in house. Many merchandising methods in use by Red Owl and its competitors, however, are generally known in the retail food business.

The retail warehouse food marketing concept was adopted by Red Owl at the insistent sponsorship of plaintiff under the name of Country Store. Customers shop within the store, pay for their groceries, bag them and carry them out alone without any special service. The reduced operations cost results in a reduced retail price. Since adoption by Red Owl, this concept has grown to become a profitable arm of its business. This concept has also been adopted, and is now in extensive use, by other retail food enterprises.

Plaintiff's employment with Red Owl was terminated effective August 31, 1981. At that time, his annual base salary was $150,000, and in accordance with the terms of his employment agreement, he was entitled to

deferred compensation of three times that amount ($450,000), which he would have been entitled to draw, at his option, over a five-year or a ten-year period in monthly installments. He elected the five-year period and has been receiving $7,500 per month since August 31, 1981.

Paragraph 11 of the employment agreement provides as follows:

11. *Restricted Employment.* The Employee agrees that, so long as he is receiving either his Annual Base Salary or any deferred compensation payments pursuant to any provision of this Agreement, he will not become an officer, director or stockholder of a corporation, nor a member of a partnership, nor a trustee of a business trust, nor a participant in a joint venture which conducts a Competing Business, nor the proprietor of a Competing Business, nor an employee of such a corporation, partnership, trust, joint venture or Competing Business; provided, however, that the foregoing restriction shall not prohibit the Employee from purchasing or holding stock or other securities of any corporation (regardless of its business) which shall have securities listed upon any recognized securities exchange in the United States or Canada.

In the event the Employee defaults under or breaches the provisions of this Paragraph 11, this Agreement shall be deemed cancelled and terminated and the Employee shall thereby forfeit any right to receive, and the Company shall thereby be released from any obligation to pay, future installments of the Employee's then Annual Base Salary, if applicable, and/or any future deferred compensation payments provided for in any provision of this Agreement, anything in this Agreement to the contrary notwithstanding.

Red Owl is engaged in a very competitive business; it operates 84 retail food stores in six states—Iowa, Minnesota, South Dakota, Michigan, North Dakota and Wisconsin. Fifty-five of those stores are located in Minnesota. Snyder's Drug Stores operates 47 drug stores in Minnesota and Wisconsin; 39 stores are located in Minnesota and 8 in Wisconsin.

Plaintiff is assured of employment with a retail food business that competes with Red Owl in Red Owl's market territory. Plaintiff has not accepted that employment offer pending the determination of this action.

While the specific contractual language of paragraph 11 of the employment agreement does not include restrictions with respect to space and time, Gamble-Skogmo intends to enforce paragraph 11 of the agreement only for the period during which the deferred compensation payments are to be made (i.e., five years) and only if plaintiff engages in competitive employment with Red Owl in Red Owl's market territory.

## DISCUSSION

Generally, Minnesota courts look with disfavor on restrictive covenants in employment contracts because they operate as a restraint of trade. They are to be carefully scrutinized, but are enforceable if they are reasonable in time and geographic area and if they protect a legitimate interest of the employer. *E.g., Cherne Industrial, Inc. v. Grounds & Associates*, 278 N.W.2d 81 (Minn.1979); *Walker Employment Service v. Parkhurst*, 300 Minn. 264, 219 N.W.2d 437 (1974); *Bennett v. Storz Broadcasting Co.*, 270 Minn. 525, 134 N.W.2d 892 (1965). Minnesota has adopted the "blue pencil doctrine" for restrictive covenants in employment cases. *Davies & Davies Agency v. Davies*, 298 N.W.2d 127, 131 n. 1 (Minn.1980). Under this doctrine, a court may modify an unreasonable noncompetition agreement by enforcing it to the extent that it is reasonable.

There are two types of legitimate interests of an employer that a restrictive covenant may properly protect. The first interest is trade secrets or confidential information, and the second interest is the employer's goodwill. Because the plaintiff in this case had no significant contact with customers, he is not in a position to trade on the employer's goodwill. The defendant does claim, however, that the plaintiff had access to confidential information. The facts of the case bear out that claim. As

chief executive officer of Red Owl, Roth had access to all areas of company information and policy including long and short range planning, sales data, pricing, and the opening and closing of retail outlets. This information was not readily ascertainable by competitors, and was intended by Red Owl to be kept in house. The conclusion is inescapable that Roth had access to confidential information and that Red Owl has a legitimate business interest in protecting this information from disclosure.

Roth contends that the restrictive covenant is unreasonably broad as to time and territory, and therefore the Court should declare it to be void. With respect to reasonableness of the covenant, it is significant to note what is not involved in this matter. Roth is not an average employee who will suffer oppression if paragraph 11 of the employment agreement is enforced. He was an employee at the highest levels of the company and had equal bargaining power when entering into the employment agreement. Enforcing the restrictive covenant here will not lead to the "form of industrial peonage" condemned in *Eutectic Welding Alloys Corp. v. West*, 281 Minn. 13, 160 N.W.2d 566, 571 (1968).

This case also does not involve an attempt by Gamble-Skogmo to enjoin the plaintiff. Gamble-Skogmo does not seek to prevent Roth from accepting employment with any employer, even a direct competitor of Red Owl. It seeks only to terminate its obligation to make substantial payments to the plaintiff should he choose to accept employment from a direct competitor.

■ Moreover, Gamble-Skogmo does not seek to enforce the contractual provision to its broadest extent. Gamble-Skogmo intends to enforce the provision only if Roth engages in competitive competition with Red Owl, in Red Owl's market territory. Thus, Roth would be free to accept employment with any employer not engaged in the retail food business, or to engage in the retail food business anywhere except in Red Owl's market territory. The Court may accept such a voluntary limitation on the restrictive covenant when evaluating the reasonableness of the covenant. *See Alside, Inc. v. Larson*, 300 Minn. 285, 220 N.W.2d 274, 280 (1974).

In addition, the contract contains its own time limitation. Gamble-Skogmo seeks to forfeit deferred compensation payments to be made to Roth. Under the terms of the contract, the payments are to be made over a five-year period. Approximately one half of a year has already elapsed since the payments began. Thus, the inhibition on Roth's right to work for a competing business will last four and one-half more years.

■ Under the circumstances of this case, the restrictions contained in paragraph 11 of the employment agreement that Gamble-Skogmo seeks to enforce against Roth are reasonable. The forfeiture is tailored to fit the legitimate interest that Gamble-Skogmo seeks to protect. The forfeiture provision will be enforced only if Roth engages in direct competition with Red Owl, the company about which he has confidential information. Gamble-Skogmo's stipulation that it will enforce the forfeiture provision only if Roth works for a food retailer in Red Owl's market territory ensures that the provision will apply only if there is direct competition between Roth and Red Owl. Although the duration of the provision is comparatively long, it must be analyzed in light of the circumstances. Having been the chief executive officer of Red Owl, Roth is knowledgeable about all aspects of the company. He had access to the long range plans of the company, and the competitive advantage of having such knowledge dissipates slowly. Furthermore, the time period is commensurate with the receipt of benefits from Red Owl. Since Gamble-Skogmo is paying Roth $90,000 a year to remain loyal to Red Owl, it is not unreasonable to expect him to refrain from competing with Red Owl for the entire time that the payments continue. *See Bradford v. New York Times Co.*, 501 F.2d 51, 58 (2d Cir. 1974) (enforcement of forfeiture provision for time period commensurate with payment of benefits is reasonable).

Accordingly, IT IS HEREBY ORDERED that the plaintiff's motion for summary

judgment is denied, and the defendant's motion for summary judgment is granted. The Court declares that paragraph 11 of the employment agreement is valid and enforceable, subject to the stipulation of the parties which limits the extent of its enforcement.

LET JUDGMENT BE ENTERED ACCORDINGLY.