Dean WARD, Plaintiff and Appellant,

v.

MIDCOM, INC., Defendant and Appellee.

Nos. 20008, 20015.

Supreme Court of South Dakota.

Argued Dec. 2, 1997.

Decided Feb. 4, 1998.

Mark V. Meierhenry of Danforth, Meierhenry & Meierhenry, Sioux Falls, for plaintiff and appellant.

Monte Walz and Keith A. Gauer of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendant and appellee.

SABERS, Justice.

[¶ 1.] This matter arises out of three contracts executed between the defendant corporation and an employee/shareholder. The disagreement centers on the enforceability of an amended stock purchase agreement and its noncompetition clause. The trial court ruled (1) the noncompetition provision was unenforceable, and (2) the amended stock purchase agreement was not severable and therefore also unenforceable. Midcom appeals (1) and Ward appeals (2). We reverse (1), holding the noncompetition clause was partially enforceable, requiring (2) an increased price under the amended stock purchase agreement.

## FACTS

[¶ 2.] Dean Ward worked for Midcom, Inc., a Watertown electronics firm, in February of 1987 after Midcom was bought by Persona, Inc.[1] The purchase of Midcom was a leveraged transaction, with $2,700,000 borrowed toward the approximate purchase price of $3,300,000. On July 10, 1987, Ward paid $18,000 for 705.88236 Midcom shares, which were immediately pledged as collateral for the bank loan. Ward's purchase represented 3.25% ownership of shares in the company.

[¶ 3.] Also on July 10, 1987, Ward [2] entered into a stock purchase agreement (SPA1) with Midcom which obligated Midcom to buy back the stock upon Ward's request, death, or termination of employment. SPA1 provided that the buy-back price was to be "based on the book value of the corporation, based on internal company generated financial statements[.]"

[¶ 4.] On July 31, 1989, Ward and Midcom executed an "ADDENDUM TO STOCK PURCHASE AGREEMENT" (Addendum), which provided in part:

II

*RECITALS:*

A. On July 10, 1987 Midcom, Inc. entered into a Stock Purchase Agreement with certain key employees to permit them to purchase shares of Class B non-voting common stock in the Corporation. This agreement is an Addendum to the July 10, 1987 Stock Purchase Agreement.

. . . . .

C. Under the July 10, 1987 Stock Purchase Agreement, Midcom is required to repurchase the individual Shareholder's shares upon his death, termination of employment or request. The repurchase price is the book value of the corporation

---

1. Ward was terminated by Midcom's previous owner, Midland–Ross, shortly before the sale to Persona. Persona offered Ward comparable wages and stock ownership to induce him to return to Midcom.

2. Five other employees bought stock and entered into the same agreement as Ward. However, none are parties to this lawsuit or appeal.

per share, based on internal company generated financial statements[.]

D. In connection with a Stock Purchase Agreement among the Persona, Inc. Shareholders, they are annually required to determine the fair market value of the Persona stock. In this process, Persona annually determines the fair market value of Midcom, Inc.

E. The purpose of this Addendum is to encourage these Class B Shareholders to remain at Midcom and Persona as productive employees over a long period of time by increasing their participation in the growing equity of Midcom, Inc.

### III

*CONSIDERATION:*

As part of the consideration for Midcom's agreements in this Addendum, each of the Shareholders agrees for himself that:

. . . . .

B. In the event of the termination of employment of any of these Shareholders, the terminated employee shall not, directly or indirectly, enter into competition with Midcom or Persona for a period of five years; nor shall he divulge any trade secrets of Midcom or Persona.

### IV

*STOCK VALUATION:*

. . . . .

B. In the event that Midcom, Inc. becomes obligated to purchase a Shareholder's shares under [SPA1] because of the Shareholder's termination of employment or request for repurchase for reasons other than the Shareholder's disability, except under conditions which violate the shareholder agreements of Article III above, the purchase price shall be the "book value per share" price described in [SPA1] plus the portion of the "fair market value per share" price described in the following schedule:

1. For each of the first five full years of the Shareholder's employment at Persona or Midcom after February 10, 1987, five percent (5%) of the difference between the "book value per share" and the "fair market value per share," plus

2. For each of the second five full years of the Shareholder's employment at Persona or Midcom after February 10, 1987, seven percent (7%) of the difference between the "book value per share" and the "fair market value per share," plus

3. For each of the third five full years of the Shareholder's employment at Persona or Midcom after February 10, 1987, eight percent (8%) of the difference between the "book value per share" and the "fair market value per share."

Thus, after fifteen full years of employment at Persona or Midcom after February 10, 1987, the purchase price of the Shareholder's stock shall be the fair market value rather than the book value.

The fair market value used in the calculation described above shall be the last fair market value determined by the Persona, Inc. Shareholders preceding the Midcom Shareholder's death, termination of employment or request for repurchase.

[¶ 5.] The final agreement executed by the parties was another stock purchase agreement (SPA2) dated December 18, 1992, in which it was agreed that the shareholders who held Class B stock under SPA1 could exchange their stock for Class A stock for no additional consideration. SPA2 provided that the Class A stock "shall continue to be bound by the restrictions on transfer, valuation agreements and other provisions contained in [SPA1 and Addendum]."[3] SPA2 also contained the following "savings" clause:

The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and the Agreement shall be construed in

---

3. SPA2 also provided for new stock purchases by persons not parties to this case. The price paid by them demonstrates the increased value of Midcom. In 1987, Ward paid slightly over $25.00 per share; the new purchasers under SPA2 paid $532.20 per share less than six years later.

all respects as if such invalid or unenforceable provisions were omitted.

[¶ 6.] Ward's employment with Midcom ended on September 29, 1995.[4] Ward brought a declaratory judgment action to determine the legal effect of SPA1, the Addendum, and SPA2. On cross-motions for summary judgment, the trial court granted partial summary judgment to Ward, ruling 1) the Addendum was void because its non-competition agreement was unlawful in the absence of a geographical limitation, and therefore, 2) SPA1's stock valuation formula dictated the buy-back price. The court ordered Midcom to buy back Ward's shares at book value rather than at the increased price provided by the Addendum.[5] The trial court held that the savings clause of SPA2 served only to save SPA2's provisions to the exclusion of *its* unlawful noncompetition clause, but did not affect the Addendum.

[¶ 7.] Ward appeals, agreeing with the trial court that the Addendum's noncompetition agreement is unlawful but claiming that the Addendum's stock valuation formula is severable and thus enforceable. He argues that the savings clause of SPA2 effectively treats the Addendum as though it never contained the noncompetition clause, leaving its increased stock valuation formula in full force.

[¶ 8.] By notice of review, Midcom argues the noncompetition agreement is lawful and the entire Addendum enforceable. Midcom states it "has remained ready and willing to pay Ward the approximate sum of $1.2 million to repurchase his stock as determined by the formula set forth in [Addendum] provided Ward is required to likewise live up to his end of the bargain, the five year noncompetition agreement contained in the same contract." Because we find Midcom's notice of review issue dispositive, we do not address Ward's arguments regarding the effect of SPA2's savings provision on the earlier contracts. *See Wood v. City of Crooks,* 1997 SD 20, ¶ 1 n.2, 559 N.W.2d 558, 559 n.2 ("Principles of judicial restraint dictate that when an

issue effectively disposes of the case, other issues that are presented should not be reached.") (quoting *Poppen v. Walker,* 520 N.W.2d 238, 248 (S.D.1994)).

## STANDARD OF REVIEW

■ [¶ 9.] The construction of a contract is a question of law which we review de novo. *Schleuter Co., Inc. v. Sevigny,* 1997 SD 68, ¶ 15, 564 N.W.2d 309, 313 (citing *Alverson v. Northwestern Nat'l Cas. Co.,* 1997 SD 9, ¶ 5, 559 N.W.2d 234, 235). Questions of statutory interpretation also require de novo review. *Maynard v. Heeren,* 1997 SD 60, ¶ 5, 563 N.W.2d 830, 833. Since there are no factual issues in this case, summary judgment will be affirmed if the trial court correctly decided the legal issues presented. *Weiss v. Van Norman,* 1997 SD 40, ¶ 9, 562 N.W.2d 113, 115 (citations omitted).

## [¶ 10.] WHETHER THE NONCOMPETITION PROVISION IS ENFORCEABLE.

■ [¶ 11.] A noncompetition agreement is a contract in restraint of trade and such contracts are generally void. *See* SDCL 53–9–8:

> Every contract restraining exercise of a lawful profession, trade, or business is void to that extent, except as provided by §§ 53–9–9 to 53–9–11, inclusive.

As indicated, SDCL 53–9–9 through –11 provide the exceptions to the general rule. We agree with the trial court that because the noncompetition clause was executed in conjunction with a stock buy-back agreement, SDCL 53–9–9 applies:

> One who sells the good will of a business may agree with the buyer to refrain from carrying on a similar business within a specified county, city, or part thereof, so long as the buyer or person deriving title to the good will from him carries on a like business therein.[6]

---

4. The record is silent regarding the circumstances of his termination.

5. Midcom repurchased Ward's shares at SPA1's book value of approximately $900,000. Under

the Addendum, Ward would be entitled to an additional amount of approximately $300,000.

6. SDCL 53–9–9 was amended effective July 1, 1997 and allows for a broader geographical limitation: .

*See* 6A *Corbin on Contracts* § 1388, at 59–60 (1962):

> It is usually held that a shareholder in a corporation has an interest in the good will as well as in the tangible assets to such an extent as to justify a promise by him, made to a purchaser of his shares, that he will not thereafter compete with the corporation within a reasonable space and time. This is proper in case the shareholder who sells has theretofore been actively engaged in the conduct of the business with a wide acquaintance with the customers; but generally the decision is not made dependent on this. The test of legality should be not whether the shareholder owned a share of the good will but whether the corporate good will would be substantially affected by the shareholder's opening a business of his own.

(Collecting cases) (footnotes omitted).

[¶ 12.] Application of SDCL 53–9–9 to a covenant not to compete executed in conjunction with the sale of stock is not new in this state. In *Public Opinion Publishing Co. v. Ransom*, 34 S.D. 381, 148 N.W. 838 (1914), this court discussed the sellers' breach of their covenant not to compete against a publishing company following the transfer of the sellers' interest in that company. The sellers argued that, as stockholders, they were not possessed of the good will of the business. In rejecting their argument, this court stated in part:

> Why should it not be possible for a corporation engaged in business to also sell its business and its good will and be able to receive a greater consideration therefor by giving to the purchaser, not only its covenant not to become a rival, but the covenant of those who may in fact hold the good will of the business within their absolute control—the only persons who could in fact and truth become rivals and thus injuriously affect the purchaser's business?

We can see no reason why those whose act is necessary for the real transfer of the good will of a business, and who by such transfer are able to enhance the selling price of such business and thus bring a direct benefit to themselves, *as would be the case of a stockholder in a corporation,* should not be permitted to unite in the transfer of the good will of such corporation, and in connection therewith contract not to become rivals and competitors. Every reason which is held to sustain the validity of a contract in restraint of trade, when made by the owner of the business, will sustain the validity of such a contract.

*Id.* at 389, 148 N.W. at 840–41 (construing § 1278 of SDCompL (1913), the forerunner to SDCL 53–9–9) (emphasis added). Therefore, we next determine if the noncompetition clause is enforceable under SDCL 53–9–9.

[¶ 13.] The trial court held that the noncompetition clause did not comport with the statute because it did not include a territorial limitation. Midcom argues the omission of a territorial limitation is not fatal to the clause and cites *Igoe v. Atlas Ready–Mix, Inc.*, 134 N.W.2d 511 (N.D.1965), for the proposition that the court may restrict the parties' contract to statutory time or territorial limitations. There, the court was required to construe North Dakota's "sale of good will" statute, which is virtually identical to SDCL 53–9–9: [7]

> One who sells the good will of a business may agree with the buyer to refrain from carrying on a similar business within a specified county, city or village, or a part of either, so long as the buyer or any person deriving title to the good will from him carries on a like business therein[.]

N.D.Cent.Code § 9–08–06 (as cited in *Igoe,* 134 N.W.2d at 513). In *Igoe,* the chairman of the board of the corporate seller of Atlas Ready–Mix covenanted not to

---

Any person who sells the good will of a business may agree with the buyer to refrain from carrying on a similar business within a specified county, city, or other specified area, as long as the buyer or person deriving title to the good will from the seller carries on a like business within the specified geographical area.

The earlier version governs this case since it arose prior to the amendment.

7. The North Dakota Supreme Court cited *Public Opinion Publishing* in its conclusion that a stockholder may covenant not to compete with the buyer of his shares when the sale involves the transfer of good will. *See Igoe,* 134 N.W.2d at 514–15.

engage in the ready-mix or concrete basement construction business within the City of Bismarck or the City of Mandan.

The court ruled that the noncompetition agreement was enforceable in Bismarck, but not Mandan:

> [T]he contract discloses that the real estate which was sold as part of the business consisted of approximately one acre of land lying near a railroad right of way in Burleigh County and lots within the city of Bismarck in Burleigh County. The covenant not to compete in business is therefore valid and enforceable in Bismarck, but illegal and unenforceable in Mandan, as our statute makes such a restraint legal in only one village or one city or one county.

*Igoe,* 134 N.W.2d at 518.

■ [¶ 14.] Similarly, this court has previously brought similar noncompetition agreements into compliance with the statutory language via partial enforcement. *See, e.g., Loescher v. Policky,* 84 S.D. 477, 481–82, 173 N.W.2d 50, 53 (1969) (ruling that an agreement which exceeded statutory territorial and time limits could be enforced within the limits authorized by statute):

> It will be noted that the legislature inserted the words "is to that extent void" in the original statute [current version reads "is void to that extent"]. Decisions from other states with like statutes generally have construed this to mean, as applied to [the] following section relative to the sale of the good will of a business, that a contract restraining the seller of the business from engaging in a competitive business is not wholly void when either time or area exceeds limits permitted by statute.

. . . .

If the contract is unrestricted as to the territory in which the seller agreed to refrain from competition with the purchaser of his business, or if it includes more territory than that provided by law it will be construed to be operative within the county or portion thereof in which the business is located. And if the agreement is indeterminate as to the period of its operation, or is without time limit, the court will construe it to cover the time permitted by law.[8]

(Noting this viewpoint is shared by the majority of states with similar statutes) (citations & internal quotation omitted); *see also Public Opinion Publ'g,* 34 S.D. at 386, 148 N.W. at 839 (refusing to invalidate covenant on basis that no time limit was included):

> [T]he provisions of such contracts should be construed in the light of the surrounding circumstances, and ... the intent of the parties should be carried out, *if such intent is one which the law sanctions.*

(Emphasis added).

> It is believed that the rule for partial enforcement is the better rule and should be applied in any case in which nothing is wrong with the agreement except that the parties have agreed upon a restraint that is somewhat in excess of what protection of the good will requires.

*Corbin, supra* § 1390, at 77; *Igoe,* 134 N.W.2d at 518.[9]

■ [¶ 15.] Midcom argues that Ward should be prevented from competing in its worldwide "market territory," which encompasses at least 84 countries. Midcom cites Gateway 2000, Inc. v. Colligan, Civ. No. 95–4100 (DSD Aug. 10, 1995), to support its argument. Reliance on *Colligan* is misplaced, as it was decided under SDCL 53–9–

---

**8.** Here, the contract provides for a noncompete period of five years, which is clearly lawful under SDCL 53–9–9.

**9.** The *Igoe* decision also explains the "blue pencil rule," by which

> the divisibility of a promise in excessive restraint of trade is determined by purely. mechanical means: if the promise is so worded that the excessive restraint can be eliminated by crossing out a few of the words with a "blue pencil," while at the same time the remaining words constitute a complete and valid con-

tract, the contract as thus "blue pencilled" will be enforced. By some occult process, the courts adopting this rule convinced themselves that partial enforcement without the aid of a "blue pencil" would be "making a new contract for the parties" while partial enforcement in the wake of a "blue pencil" is not.

*Igoe,* 134 N.W.2d at 517 (quoting *Corbin, supra* § 1390). We agree with *Igoe's* and Professor Corbin's rejection of the need for a "blue pencil" to enable partial enforcement.

11, which permits covenants not to compete in employment contracts, and allows for a territorial limitation within "a specified county, city *or other specified area....*" (Emphasis added). Also of no support is *Roth v. Gamble–Skogmo, Inc.,* 532 F.Supp. 1029 (D.Minn.1982) (employment contract). The *Roth* court was unconfined by the limitations of a statute when it enforced a wide-reaching covenant not to compete by employing a "reasonableness" analysis.[10]

[¶ 16.] While a global limitation may be permissible in a future "sale of good will" under the amended SDCL 53–9–9, see *supra* n.6, the applicable version of the statute expressly limits noncompetition agreements to "a specified county, city, or part thereof," and we are bound by the statute's provisions in effect when the contract was executed.[11]

[¶ 17.] In the alternative, Midcom argues that Ward should be precluded from competing against it in Codington County. The trial court considered and rejected this option, stating, "[l]imiting the non-compete to the Codington County area would not serve Midcom's interests." However, Midcom argues otherwise and points out the following:

> In fact, a competing business within Codington County would hurt Midcom's business interests on several fronts. First, such a business would compete in the important market for available employees, particularly those with knowledge and experience in the transformer industry. As the number of qualified employees is limited, a competitor might certainly set up shop in Codington County to tap the available market of employees with experience, draining skilled employees from Midcom. Further, such a competitor would be better able to target key management employees and engineers to move "across town" rather than across the continent, also decreasing the competitor's costs in regard to such recruitment. *In fact, this is exactly what has happened.*

(Emphasis added). Midcom's argument is persuasive, and, as noted *supra* n. 10, a showing of reasonableness is unnecessary under these circumstances. This territorial limitation comports with this statute and we hold that the noncompetition agreement is enforceable in Codington County.

[¶ 18.] The order granting partial summary judgment to Ward is reversed and the case remanded for entry of an order granting summary judgment to Midcom. Accordingly, Ward must honor the noncompetition agreement in Codington County and Midcom must pay the additional amount due under the Addendum.

[¶ 19.] MILLER, C.J., and AMUNDSON, KONENKAMP, and GILBERTSON, JJ., concur.

---

10. This court has held that "reasonableness" *does not enter into the analysis except in limited* situations. *Compare American Rim & Brake, Inc. v. Zoellner,* 382 N.W.2d 421, 424 (S.D.1986) ("SDCL 53–9–11 allows employers and employees to make exactly the kind of agreement entered into between American and defendants, without a further showing of reasonableness."), *with Central Monitoring Serv., Inc. v. Zakinski,* 1996 SD 116, ¶¶ 42–49, 553 N.W.2d 513, 519–21 (drawing a distinction between 1) employees who quit or who are fired for cause and 2) those who are fired through no fault of their own. As to the latter, the trial court must balance the competing interests of the former employee, the employer, and the public to determine whether the noncompete agreement is reasonable).

Here, there are at least two reasons for not requiring a "reasonableness" determination. First, there is no finding in the record regarding the circumstances of Ward's departure from Midcom. Second, the agreement was executed in conjunction with a stock repurchase agreement and is therefore subject to analysis under SDCL 53–9–9 (sale of good will), not SDCL 53–9–11 (employment contracts).

11. This court is not unsympathetic to the position advanced by Midcom; as far back as 1914, this court commented with disfavor upon these statutory limitations:

> In a very few states, among them being this state, the Legislatures, disregarding the fact that what might be a reasonable restraint, either as to time or territory, under certain conditions, *would not be reasonable* under other conditions, have enacted statutes fixing limitations both as to time and territory.

*Public Opinion Publ'g,* 34 S.D. at 385, 148 N.W. at 839.